Eddie J. STANTON,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a Amtrak, a foreign corporation; CSX Transportation, Inc., a foreign corporation; and M.L. Cheatwood, an individual.

Civ. A. No. 92–A–1582–N.

United States District Court,
M.D. Alabama,
Northern Division.

April 19, 1994.

William D. Melton, Evergreen, AL, for plaintiff.

William A. Shashy, Montgomery, AL, for defendants.

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

ALBRITTON, District Judge.

This cause is now before the court on the motion for partial summary judgment filed by Defendants, National Railroad Passenger Corporation ("Amtrak"), M.L. Cheatwood ("Cheatwood"), and CSX Transportation, Inc. ("CSX") on January 3, 1994.

Plaintiff, Eddie J. Stanton ("Stanton"), filed this action on December 14, 1992 in the Circuit Court of Lowndes County, Alabama. Defendants removed the case to this court on December 22, 1992. Stanton alleges negligent and/or wanton conduct in both the operation of an Amtrak train and in the maintenance of a railroad grade crossing.

On the other hand, Defendants contend that Stanton's claims, to the extent that they are based on speed of the train and adequacy of the warning devices at the crossing, are preempted by the Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 421–47 and the Federal Railroad Administration's ("FRA") regulations related to trains' speed. *See* 49 C.F.R. § 213.9.

For the reasons stated below, the court finds that Defendants' motion for partial summary judgment is due to be granted in part and denied in part.

### II. FACTS

On May 20, 1992, an Amtrak train operated by Cheatwood struck a National Guard truck operated by Stanton. At the time of the accident, the train was traveling south on a track owned by CSX and Stanton was traveling west on Tyson Road in Lowndes County, Alabama. As a result of the colli-

sion, Stanton sustained severe personal injuries. Subsequently, he filed this action.

### III. SUMMARY JUDGMENT STANDARD

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the non-movant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must by affidavit or other appropriate means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

■ The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried, and if not, whether the movant is entitled to a judgment as a matter of law. *See Dominick v. Dixie National Life Insurance Company*, 809 F.2d 1559 (11th Cir.1987). It is the substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). *See also DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir. 1989).

■ When the court considers a motion for summary judgment it must refrain from deciding any material factual issues. All the evidence and the inferences from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990). *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution.

### IV. DISCUSSION

#### A. Preemption—General Principles

■ Where a state statute conflicts with or frustrates federal law, the former must give way. U.S. Const., Art. VI, cl. 2; *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). In the interest of avoiding unintended encroachment on the authority of the states, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption. Thus, preemption will not lie unless it is "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Evidence of preemptive purpose is sought in the text and structure of the statute at issue. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983); *Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1524 (11th Cir.1994) (citations omitted).

#### B. The Federal Railroad Safety Act ("the FRSA")

The FRSA was enacted in 1970 to reduce railroad-related accidents and deaths and to improve rail safety in general. 45 U.S.C. § 421, *et seq.* The Act empowers the Secretary of Transportation ("the Secretary"), through the FRA, to promulgate such regulations as necessary to improve safety. *Southern Pacific Transp. Co. v. Oregon Public Utility Comm'n*, 9 F.3d 807, 812 (9th

Cir.1993). The preemptive effect of these regulations on state laws is governed by § 434 of the Act, which reads:

The Congress declares that laws, rules, regulations, orders and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

45 U.S.C. § 434.

### C. CSX Transp., Inc. v. Easterwood

#### 1. Excessive Speed Preemption

█ The issue of whether Stanton's excessive speed claim is preempted by federal law is controlled by the Supreme Court's recent decision in *CSX Transp., Inc. v. Easterwood,* —— U.S. ——, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).[1] In *Easterwood,* the plaintiff although conceding that the train was traveling under the maximum speed allowed by the federal regulations at the railroad crossing in question, argued that defendant still, "breached its common-law duty to operate its train at a moderate and safe rate of speed." —— U.S. at ——, 113 S.Ct. at 1742.

The Court, however, rejected this argument and held that "under the [FRSA], federal regulations adopted by the Secretary of Transportation preempt" common-law speed restrictions. *Id.* —— U.S. at ——, 113 S.Ct. at 1744. After discussing the background of the FRSA and its preemptive effect, the Court recognized that the Secretary had issued federal regulations which "set maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel." *Id.* —— U.S. at ——, 113 S.Ct. at 1742 (*citing* 49 C.F.R. § 213.9 (1992)). The Court explained that:

[o]n their face, the provisions of [49 C.F.R.] § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort which [Easterwood] seeks to impose.... Read against this background, [49 C.F.R.] § 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings.

—— U.S. at ——, 113 S.Ct. at 1742–43. As such, the Court found that plaintiff's "excessive speed claim cannot stand in light of the Secretary's adoption of the regulation in [49 C.F.R.] § 213.9." *Id.* at 1743.[2]

---

1. In *Easterwood,* plaintiff's husband was killed when his truck was hit by a train, owned and operated by defendant, at a road crossing in Catersville, Georgia. —— U.S. at ——, 113 S.Ct. at 1735. Plaintiff, Easterwood, brought a diversity action, claiming that defendant was negligent in failing to maintain an adequate warning system at the crossing and for operating the train at an excessive speed. The District Court for the Northern District of Georgia granted summary judgment for defendant on the grounds that both claims were preempted by the FRSA. *Easterwood v. CSX Transp., Inc.,* 742 F.Supp. 676, 679 (N.D.Ga.1990). Upon appeal the Eleventh Circuit reversed the district court in part, holding that the claim, premised upon allegations of inadequate warning systems, was not preempted;

the court, however, affirmed the district court's finding that plaintiff's claim of negligence, based upon excessive speed, was preempted by the FRSA. *Easterwood v. CSX Transp., Inc.,* 933 F.2d 1548, 1560 (11th Cir.1991).

2. Accordingly, several district courts have applied *Easterwood* and held that if the speed of a train complies with the federal regulations, any common law claim that the train was traveling in excess of a safe rate of speed is preempted by federal law, under the FRSA. *Elrod v. Burlington Northern R.R. Co.,* Nos. J–C–92–270 & 271, 1993 WL 667635, mem. op. at 5 (E.D.Ark. Sept. 17, 1993); *Bowman v. Norfolk Southern Ry.,* 832 F.Supp. 1014, 1017 (D.S.C.1993) (citations omitted); *Eldridge v. Missouri Pacific R.R.,* 832

■ In the instant case, the speed limit at the crossing, based upon the federal regulations, was 80 mph. *See* 49 C.F.R. § 213.9(a). Defendants have presented the testimony of Cheatwood, the engineer operating the train at the time of the accident, stating the train was traveling at 79 mph. On the other hand, Stanton argues that the train's "speed or computer tape," which would have recorded the train's speed, was intentionally destroyed by the Defendants. The adverse inference to be drawn from the destruction of this evidence is that the train was traveling in excess of the speed limit at the time of the collision.

In *Vick v. Texas Employment ·Comm'n*, 514 F.2d 734, 737 (5th Cir.1975), the former Fifth Circuit upheld a trial court's finding for the defendant employment commission in a sex discrimination case, despite the fact that records relevant ·to the plaintiff's employment had been destroyed by the commission's personnel prior to trial.[3] In so ruling, the court explained that, in the absence of a finding that the employment commission had acted in bad faith, no adverse inference as to the probative value of the destroyed documents was called for. The commission's records on the plaintiff were destroyed before trial pursuant to the commission's regulations governing disposal of inactive records. *Vick*, 514 F.2d at 737. *See Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1111 (8th Cir. 1988) (records destroyed pursuant to policy). The court recognized that "[t]he adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant. 'Moreover, the circumstances of the act must manifest bad faith. Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case.' " *Id.* (citation omitted).

The facts of the present case differ from those which led the former Fifth Circuit in *Vick* to uphold the trial court's decision not to draw an adverse inference from the defendant's destruction of records. Here there is a question of genuine material fact as to the motivation behind Defendants' actions. *Cf.*

*Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 134 (S.D.Fla.1987). Defendants offer the deposition testimony of Roderick L. Quibodeaux ("Quibodeaux"), Amtrak's assistant transportation manager at the time of the accident, and Manuel J.·Vega ("Vega"), an Amtrak safety coordinator. Quibodeaux testified that at the time of the accident he notified the "power desk" in Philadelphia, Pennsylvania, and requested that the train's "computer tape" be downloaded upon the train's return to Washington, D.C. Vega, who worked in Washington, testified that he was not instructed to remove the tape. He also provided two possible explanations: (1) "the key people that were supposed to remove the ... tape never had any knowledge [that] it [was] to be removed" or (2) the tape could have recorded improperly and left nothing to be downloaded.

Quibodeaux's and Vega's testimony does not demonstrate that the train's speed or computer tape was destroyed as part of standard Amtrak procedures. In fact, their testimony establishes that it is Amtrak's procedure to save the tape after an accident. Because Defendants cannot explain the circumstances surrounding the destruction of the tape, the court finds that there is a genuine issue of fact regarding the motivation behind their conduct. Therefore, for the purposes of summary judgment, this court must give Stanton the benefit of the adverse inference to be drawn from the missing tape, i.e., that the train was traveling in excess of the speed limit. *Earley*, 907 F.2d at 1080. *See also Matsushita Electric Industrial Co.*, 475 U.S. at 587, 106 S.Ct. at 1356. Thus, there is also a question of genuine fact as to the speed at which the train was traveling at the time of the collision. While state law is preempted as to the speed limit and Plaintiff cannot base his claim on speed if the train's speed did not exceed 80 mph, there is a fact issue as to whether that speed was exceeded.

Accordingly, the court finds that Defendants' motion for partial summary judgment, to the extent that it is based on a claim of excessive speed, is due to be denied.

---

F.Supp. 328, 330 (E.D.Okla.1993); *Watson v. Rail Link, Inc.*, 826 F.Supp. 487, 490 (S.D.Ga. 1993).

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

## 2. Preemption of the Inadequate Warning Device Claim

■ *Easterwood* also controls Stanton's claim to the extent it is based upon a claim that the warnings at the crossing were inadequate.[4] In *Easterwood*, the Court addressed the preemption of claims based on inadequate warning devices at grade crossings. It examined the preemptive effect of a series of regulations promulgated by the Secretary which address grade crossing safety. After discounting several regulations, the Court examined the preemptive effect of 23 C.F.R. §§ 646.214(b)(3) & (4).

These regulations provide that particular warning devices must be installed, or federal approval must be obtained, for certain crossing projects. Because these regulations "displace state and private decision making authority" about the devices required at certain crossings, the Court concluded that "when [these regulations] are applicable state tort law is preempted." *Easterwood*, — U.S. at ————, 113 S.Ct. at 1740–41. Section 646.214(b)(3) applies to projects in which federal funds participate in the installation of warning devices.[5] Therefore, the preemption issue in *Easterwood* turned on whether federal funds participated in the installation of warning devices at the crossing where the collision occurred. *Id.* — U.S. at ——, 113 S.Ct. at 1741.[6]

In *Easterwood*, the Georgia Department of Transportation had actually planned to upgrade the crossing in question and had initially set money aside for the plan. *Id.* — U.S. at ————, 113 S.Ct. at 1741–42. Nevertheless, the Court found no preemption had occurred because no federal funds actually participated in the installation of warning devices at that crossing. *Id. See Bowman*, 832 F.Supp. at 1019; *Landrum v. Norfolk Southern Corp.*, 836 F.Supp. 373, 377 (S.D.Miss.1993); *Southern Pacific Transp., Inc. v. Builders Transport, Inc.*, 1993 WL 185620 at *4–5 (E.D.La. May 25, 1993) (following *Easterwood* and finding no preemption of state-law negligence action based on inadequate warning devices even though crossing had been rated, evaluated, and prioritized to receive an upgrade using federal funds). *But see Hatfield v. Burlington Northern R. Co.*, 1 F.3d 1071, 1072 (10th Cir.1993).[7] The plaintiff's claim was, there-

---

4. Stanton suggests that *Easterwood* is inapplicable to the present case, because the case involves a claim that the warning device in question was defective as opposed to inadequate as in *Easterwood*.

   Defendants' motion asks for summary judgment as to a claim based upon "adequacy" of the warnings at the crossing. The evidence before the court is insufficient to advise the court as to the precise nature of any claimed inadequacy and the parties do not brief whether there can be common law liability based upon a warning system deemed adequate because of federal preemption which becomes defective as a result of negligence in its upkeep. This opinion is not intended to address the question of a device which would be adequate if working but which is defective because of negligent breach of some duty to keep it in working order. The Defendants are invited to address this issue specifically in a supplemental brief if they wish.

5. The requirements of 23 C.F.R. § 646.214(b)(3) also apply to railroad grade crossings located within the limits of, or near the terminus of, a federal-aid highway project.

   "Passive warning devices" are those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of train. 23 C.F.R. § 646.204(i).

   "Active warning device" are those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train. 23 C.F.R. § 646.204(j).

6. "In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which [Easterwood] relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings." *Id.* — U.S. at ——, 113 S.Ct. at 1741. *See* 23 C.F.R. §§ 646.214(b)(3) & (4) (1992).

7. In *Hatfield*, the Tenth Circuit recognized a more expansive interpretation of the meaning of "participation." 1 F.3d 1071, 1072. It stated:

   Given the Court's reliance upon the presumption against preemption, *Easterwood*, [— U.S. at ——,] ..., 113 S.Ct. at 1739, logic dictates

fore, not preempted, and she was permitted to pursue her action under the applicable state negligence laws.

Stanton makes three arguments in support of his position that there is no preemption of his inadequate warning device claim. First, he contends that any federal funds expended were prior to the passage of the FRSA. Second, he argues that in order for there to be preemption on his defective warning device claim, there must have been a federally funded automatic gate in place. Finally, Stanton maintains that there is no preemption because the installation of "certain stripping and signs" at the crossing in question was in compliance with the Manual on Uniform Traffic Control Devices ("MUTCD") and not the FRSA.

The court, however, is not persuaded by Stanton's arguments. First, the relevant inquiry is not whether federal funds were used after the enactment of the FRSA, as Stanton contends, but rather whether federal funds "participated" in the installation of warning devices before the time of the accident in question. *See Hatfield,* 1 F.3d at 1072 ("the precise issue to be resolved is whether 'federal-aid funds participate[d] in the installation of [a warning] device' prior to the collision . . ."). Moreover, Defendants have produced evidence that significant amounts of federal funds were expended after the enactment of the FRSA. Second, Stanton's contention that in order for there to be preemption there must be an automatic gate at the crossing is incorrect. The *Easterwood* court clearly stated that "under §§ 646.214(b)(3) and (4), a project for the improvement of a

grade crossing must *either* include an automatic gate *or* receive FHWA approval if federal funds 'participate in the installation of the [warning] devices.' " —— U.S. at ——, 113 S.Ct. at 1741 (footnote omitted and emphasis added). In the instant case, the agreements submitted by Defendants in support of their argument that federal funds participated in the installation of warning devices at the Tyson Road crossing, are signed by Federal Highway Administration officials.

█ Stanton's final argument is that the expenditure of federal funds on passive warning devices are mandated under the MUTCD and therefore, insufficient to establish preemption. In *Easterwood,* the court determined that the MUTCD was not a basis for federal preemption of common-law grade crossing claims. *Id.* —— U.S. at ——, 113 S.Ct. at 1740. In fact, it characterized the MUTCD as merely a manual devoted to describing the "proper size, color, and shape of traffic signs and signals." *Id.* The MUTCD itself states that " '[i]t is the intent that the provisions of this Manual be standards for traffic control devices installation, but not a legal requirement for installation.' " *Id.* (citation omitted). Thus, Stanton's contention that the installation of the passive warning devices in question were required under the MUTCD is incorrect.

As previously discussed, after discounting the MUTCD as a basis for preemption, the *Easterwood* court concluded that 23 C.F.R. §§ 646.214(b)(3) & (4) provide a basis for preemption of common-law claims regarding

that more than a casual financial connection between the federal government and the project has to exist before that project is governed and circumscribed by federal regulation. Thus, we conclude the degree of federal participation must be significant.

Does that mean, however, that federal funds be earmarked specifically in a sum certain before participation occurs? We do not believe so. Moreover, there is nothing within either the regulations or in the Court's holding in *Easterwood* that suggests participation occurs only when earmarked dollars are dedicated to installation of warning devices at a particular project. Indeed, the generic significance of the word "funds" suggests a fungibility that covers more than the expenditure of cash on actual construction of a project. Thus, participation may take place when other re-

sources, for example significant personnel time remunerated by federal-aid funds, are utilized at some point in the project.

*Hatfield,* 1 F.3d at 1072.

On remand, Chief Judge Patrick F. Kelly applied the Tenth Circuit's relaxed participation standard. He found that, "[t]he fact that the federal government explicitly undertook to provide funding for the preliminary engineering of [a] crossing upgrade, an undertaking which took place prior to the plaintiff's accident . . ., appears to be sufficient to trigger preemption under § 646.214(b)(3)." *Hatfield v. Burlington Northern R. Co.,* 848 F.Supp. 158, 159 (D.Kan.1994).

The court notes that because there were significant amounts of federal funds actually expended on the crossing in question, it need not express an opinion on the appropriate definition of "participation."

the adequacy of warning devices. —— U.S. at ——, 113 S.Ct. at 1741. It stated that "§§ 646.214(b)(3) and (4) displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained. Indeed, §§ 646.214(b)(3) and (4) effectively set the terms under which railroads are to participate in the improvements of crossings." *Id.* The court concluded that there was no preemption in the case before it because "[t]he[ ] facts do not establish that federal funds 'participate[d] in the installation of [warning] devices ...'" *Id.* Thus, the relevant inquiry is on actual federal funding of the installation of "warning devices." *See Hatfield,* 1 F.3d at 1072. The *Easterwood* court recognized that the definition of "warning devices," within the relevant federal regulations, includes "signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." *Id.* —— U.S. at —— n. 11, 113 S.Ct. at 1741 n. 11 (quoting 23 C.F.R. § 646.204(i)).

In the case at bar, Defendants have established that significant federal funds were expended on the installation of "passive warning devices" at the crossing. Specifically, Defendants have presented: (1) certified copies of Federal–Aid Project Agreements RS–4311(102) and 4312(102), which reflect expenditure of federal funds for passive warning devices at the Tyson Road crossing between 1982 and 1984 and (2) a certified copy of Federal–Aid Project Agreement RRP–000S–(32) which reflects the expenditure of federal funds for passive warning devices at the Tyson Road crossing in 1976.[8] These documents demonstrate that $144,-044.89 in federal funds participated in the installation of passive warning devices at the Tyson Road crossing. Therefore, the court finds that Stanton's inadequate warning system claim is preempted. *Easterwood,* —— U.S. at ——, 113 S.Ct. at 1741; *Hatfield,* 1 F.3d at 1072; *Borden v. CSX Transp., Inc.,* 843 F.Supp. 1410, 1414–15 (M.D.Ala.1993) (Varner, J.); *Landrum v. Norfolk Southern Corp.,* 836 F.Supp. 373, 377 (S.D.Miss.1993);

*Bowman,* 832 F.Supp. at 1020; *Watson,* 826 F.Supp. at 491.

Accordingly, the court finds that the Defendants' motion for partial summary judgment, to the extent that it is based on a claim that the warning system at the crossing was inadequate is due to be granted.

## CONCLUSION

For the foregoing reasons, the court finds that Defendants' motion for partial summary judgment is due to be and is hereby GRANTED in part and DENIED in part, to the extent that:

(1) Defendants' motion for partial summary judgment on Stanton's excessive speed claim is due to be and is hereby DENIED; and

(2) Defendants' motion for partial summary judgment on Stanton's inadequate warning system is due to be and is hereby GRANTED.

---

8. Defendants also argue that electrically-controlled warning devices that were placed at the Tyson Road crossing in 1967, were completely

paid for by federal funds. Stanton, however, contends that these devices were paid for by the State.