**Raul SOSA, Plaintiff,**

v.

**Peter HAMES, et al., Defendants.**

**No. 05–23079–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

Oct. 7, 2008.

John David Mallah, Maitland, FL, Peter B. Schlueter, Schlueter & Schlueter, San Bernardino, CA, for Plaintiff.

Assistant County Attorneys Craig E. Leen, Erica S. Zaron, and Eduardo W. Gonzalez, Miami–Dade County, FL, for Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court upon Defendants, Miami–Dade County (the "County"), Peter Hames ("Hames"), Eliezer Torres ("Torres"), and Elio Gonzalez's ("Gonzalez['s]") Omnibus Motion by All Defendants for Summary Judgment ("Motion") [D.E. 192], filed on June 9, 2008. Hames, Torres, and Gonzalez move for summary judgment in their favor on Plaintiff, Raul Sosa's ("Sosa['s]") 42 U.S.C. § 1983 individual capacity claims (Counts I, II and III of the Amended Complaint [D.E. 67] ), arguing that they are entitled to qualified immunity. The County moves for summary judgment as to the Section 1983 *Monell* claim (Count VI), arguing Plaintiff has failed to identify an official policy of the County that subjects it to liability.[1] The Court has carefully considered the parties' written submissions, the record, and applicable law.

## I. BACKGROUND

### A. Auto Theft Task Force

Hames was a detective in the Miami–Dade Police Department assigned to the Auto Theft Task Force (the "Task Force") from 2000 until his retirement in 2006. (*See* Dep. of Peter Hames ("Hames Dep.") [D.E. 193–2, 213–7] at 4:8 to 6:2). Torres, a detective, and Gonzalez, a sergeant, were also assigned to the Task Force. (*See* Dep. of Elio Gonzalez ("Gonzalez Dep.") [D.E. 193–4] at 5:5–14, 37:21 to 38:22; Dep. of Eliezer Torres ("Torres Dep.") [D.E. 193–5] at 59:12 to 60:7).

---

1. At a June 27, 2008 status conference, the Court indicated it would only consider challenges to the federal claims against Defendants for purposes of summary judgment.

The undersigned therefore does not address Defendants' Motion as to Plaintiff's state law claims against Torres (Count IV) and Hames (Count V).

The Task Force is a multi-agency organization comprised of officers from various jurisdictions (federal, state, county, and municipal police departments) that investigates crimes related to automobiles, including auto theft, the improper towing of automobiles, and the nonpayment of certain taxes and fees to the State of Florida. (*See* Dep. of Greg Terp [D.E. 193–10] at 96:2 to 97:19; Gonzalez Dep. at 57:17–20, 66:2–11; Torres Dep. at 59:12 to 60:2). The Task Force conducted an investigation into salvage motor vehicle dealers and the towing industry in Florida in 2003 and 2004. (*See* Investigative Report [D.E. 193–3] at 1).

**B. October 3, 2003 Search of Accion 1 Auto Sales**

Sosa operated and managed Accion 1 Auto Sales and Accion 1 Towing (collectively "Accion") in Miami–Dade County. (*See* Am. Compl. ¶ 4; Hames Dep. at 51:4–23; Investigative Report at 2–3). By October 2003, Sosa had obtained a dealership license for his business. (*See* Decl. of Raul Sosa ("Sosa Decl.") [D.E. 213–16] ¶ 14). On October 3, 2003, the Task Force conducted an administrative business inspection of Accion. (*See* Investigative Report at 2). Hames documented his version of the events at this inspection in an Investigative Report under Case/Filing Number 13870–C. (*See id.*). Sosa was not initially present but arrived while the inspection was in progress. (*See id.;* Sosa Decl. ¶ 12). Upon arriving at Accion, Sosa contacted an attorney, Manuel Gonzalez, Jr., who arrived at the scene sometime thereafter. (*See* Investigative Report at 2; Sosa Decl. ¶ 16).

The inspection revealed that Sosa was purchasing motor vehicles from other independent towing companies and selling them for salvage. (*See* Investigative Report at 3). Sosa was not transferring the titles for these vehicles into his name nor was he paying sales tax (*see id.*); Sosa

does not believe he was required to do so. (*See* Sosa Decl. ¶ 15). Sosa was also rubber stamping "Accion 1 Towing" at the bottom of the titles while signing "Accion 1 Auto Sales." (*See* Investigative Report at 3). At the conclusion of the inspection, the Task Force impounded several motor vehicles, two forklifts, two tow trucks, and a plastic box that contained miscellaneous State of Florida motor vehicle titles, towing invoices, and ledger sheets. (*See id.*).

Sosa asserts that several television crews from local media were present at Accion for the October 3, 2003 inspection. (*See* Sosa Decl. ¶ 12). While Defendants concede that media was present for an inspection at Accion, they claim the evidence is unclear as to whether the media was present at was the October 3, 2003 inspection or at a subsequent inspection that occurred in January 2004. (*See* Hames Dep. at 211:5–25).

**C. October 4, 2004 Search Warrant**

On October 4, 2004, Hames submitted an affidavit in support of a search warrant (the "Affidavit") to a state judge. (*See* Oct. 4, 2004 Aff. for Search Warrant [D.E. 194–10]). Hames sought a warrant to search Sosa's residence for documents related to the following felonies: "grand theft, forgery, [and] offenses involving vehicle identification numbers, applications and certificates, Florida State Statutes, 812.014, 831.01, and 319.33 respectively." (*Id.* at 1). In support of the request for a search warrant and to establish probable cause, Hames described the following series of events.

Hames conducted a business inspection of Diaz Towing, managed by Lazaro Galan, on September 22, 2004. (*See id.* at 2). At the inspection, Hames learned that Galan had forged Officer William Clayton's signature on blank City of Miami certificates of destruction. (*See id.;* Dep. of Orlando

Villaverde ("Villaverde Dep.") [D.E. 194–2] at 7:2 to 10:15, 25:2 to 26:7, 32:4–24; Hames Dep. at 73:13–74:24). Galan advised Hames that Accion was the only company that purchased cars from Diaz Towing. (*See* Oct. 4, 2004 Aff. for Search Warrant at 2; Villaverde Dep. at 25:2 to 26:7, 32:4–24).

As a result of this inspection, Hames described how he sought and obtained a search warrant for the business premises of Accion. (*See* Oct. 4, 2004 Aff. for Search Warrant at 2; Sept. 27, 2004 Search Warrant [D.E. 194–9]). Hames served the search warrant on Accion on September 28, 2004, when Sosa was present. (*See* Oct. 4, 2004 Aff. for Search Warrant at 2). According to Hames, no business records were found at the business offices of Accion (*see id.;* Hames Dep. at 57:12 to 58:20), a charge which Sosa denies. (*See* Sosa Decl. ¶ 34). Karen Reyes, a supervisor with the Division of Motor Vehicles, assisted Hames with the execution of the search warrant and spoke to Sosa regarding records that were required to be maintained at his business. (*See* Oct. 4, 2004 Aff. for Search Warrant at 2). Reyes asked Sosa where his business records were kept, and Sosa responded that he was keeping these records at his home. (*See id.;* Gonzalez Dep. at 155:8–16). Sosa denies this conversation occurred as described in the Affidavit. (*See* Sosa Decl. ¶ 34).

Hames was further informed by Sergeant Winsor Lozano of the City of Miami Auto Theft Unit that Lozano had reviewed the records of U–Pull–It and determined that twenty-nine stolen motor vehicles had been sold to U–Pull–It by Accion. (*See* Oct. 4, 2004 Aff. for Search Warrant at 3; Dep. of Lawrence Danielle [D.E. 194–4] at 25:8 to 29:25; Hames Dep. at 63:6 to 64:17). Hames spoke with Lawrence Danielle, the owner of U–Pull–It, and reviewed the records for the twenty-nine vehicles.

(*See* Oct. 4, 2004 Aff. for Search Warrant at 3; Hames Dep. at 68:3 to 69:23). Hames determined that all of the vehicles had been sold to U–Pull–It with forged City of Miami certificates of destruction. (*See* Oct. 4, 2004 Aff. for Search Warrant at 3; Hames Dep. at 68:3 to 69:23). A further review of U–Pull–It's records revealed that Accion had sold more than fifteen thousand motor vehicles to U–Pull–It since January 1, 2004. (*See* Oct. 4, 2004 Aff. for Search Warrant at 3; Hames Dep. at 68:3 to 69:23).

On October 4, 2004, the court issued a search warrant for Sosa's residence (the "Warrant") based upon the information contained in the Affidavit. (*See* Oct. 4, 2004 Search Warrant [D.E. 194–11]). The Warrant sought "any and all records pertaining to the purchase, sale or acquisition of, or disposal of any motor vehicle, any and all documentation written or computer generated involving computer files and programs, any and all financial records relating to offenses involved in grand theft, forgery, offenses involving vehicle identification numbers, applications, and certificates." (*Id.* at 2). The Warrant authorized officers to "seize" the property sought and "to arrest all persons in the unlawful possession thereof." (*Id.*).

### D. Execution of October 4, 2004 Search Warrant

The Warrant was executed on October 5, 2004, as a "high risk" warrant which included the use of the County's Strategic Response Team ("SRT"). (*See* Gonzalez Dep. at 160:21 to 161:1–7; Dep. of Lazaro Aleman [D.E. 194–5] at 4:2–8). No one was at Sosa's residence when the Warrant was executed. (*See* After Action Report [D.E. 194–12] at 3). The SRT wrecker was used to forcibly gain access to the front yard of Sosa's residence by removing the front gate off of its track. (*See id.*).

After officers received no response to a knock and announcement at the front door, the SRT used a sledgehammer to breach the locked door. (*See id.*).

Inside the house, a locked door leading to a bedroom was also damaged when the SRT breached it. (*See id.*). A bookshelf was damaged when the SRT moved it, and decorative ornaments were damaged as various pieces of furniture were displaced. (*See id.*). Officers removed an alarm speaker because the alarm made communications between the officers difficult. (*See id.*). Officers also removed surveillance cameras along the perimeter of Sosa's property in order to prevent the officers' positions from being monitored from inside the residence. (*See id.*). Sosa maintains the cameras were not only removed, but severely damaged. (*See* Sosa Decl. ¶ 37).

Upon executing the Warrant, police seized the following items from Sosa's residence: a plastic container containing hundreds of Accion 1 towing tickets; Florida motor vehicle titles and papers; $10,000 in U.S. currency; and two firearms and a firearm clip. (*See* Property Receipts [D.E. 196–2] at 1–4). The titles seized from Sosa's residence were open titles. (*See* Hames Dep. at 182:6–18). Sosa also claims the officers seized "video film" which is unaccounted for in the police records. (*See* Sosa Decl. ¶ 37).

### E. Sosa's October 5, 2004 Arrest

While the Warrant was being executed at Sosa's residence, Sosa arrived at his home by car. Upon his arrival, the parties agree that Sosa was removed from his car by officers, placed on the ground, and physically restrained. Sosa and Defendants' versions of the remaining facts surrounding his arrival and subsequent arrest, however, differ dramatically.

Sosa states he arrived at his residence and parked his car in front of his home on the right side of his house at the edge of the property line. (*See* Sosa Decl. ¶ 39). Sosa claims he did not drive improperly or speed at any point, and that the street was not blocked from the direction in which he drove. (*See id.* ¶ 38). Sosa maintains police cars were parked on the side of the road near his home, but no officers signaled or otherwise ordered him to stop. (*See id.*). He further denies that he either turned up his radio upon being approached by officers or put his car into reverse. (*See id.* ¶ 41).

Upon parking his car, he was surrounded by various officers in both plainclothes and black uniforms, including Hames and Gonzalez in plainclothes. (*See id.* ¶ 40). Sosa raised his hands as the uniformed officers pointed their weapons at him. (*See id.*). Hames opened the door to Sosa's car, and Gonzalez pulled Sosa from the car. (*See id.*). Sosa states "[t]hey" threw him to the ground, presumably referring to Hames and Gonzalez. (*Id.*). He then claims "the officers began to hit and kick him," but he does specifically identify which officers participated in the physical assault. (*Id.*). Sosa does not attribute any of these actions to Torres.

Defendants' version of the events is much different. Defendants claim that an outside perimeter was established at the end of the block on both sides of Sosa's residence and conducted by uniformed personnel. (*See* Dep. of Phillip Frazin ("Frazin Dep.") [D.E. 193–11] at 30:1 to 31:3; Dep. of Christian G. Winch ("Winch Dep.") [D.E. 193–6] at 14:11–20, 22:10–23). A marked police car blocked the street at the outside perimeter. (*See* Winch Dep. at 22:10–23; Torres Dep. at 206:13 to 207:5). When Sosa arrived at the house, he ran a stop sign and drove up to his residence at a high rate of speed. (*See* Torres Dep. at 212:1 to 214:5; Gonzalez Dep. at 177:8 to 178:12). Sosa crossed the outside perimeter police line and drove around a marked

police vehicle. (*See* Winch Dep. at 22:10–23; Frazin Dep. at 29:10–25, 49:2–15; Gonzalez Dep. at 165:20–166:5; Torres Dep. at 212:1 to 214:5; Hames Dep. at 186:19–189:17). Sosa slid or skidded to a halt when pulling up in front of his residence. (*See* Gonzalez Dep. at 177:8 to 178:12; Torres Dep. at 212:23 to 214:9; After Action Report at 3).

After the vehicle came to a stop, SRT personnel ordered Sosa to show his hands and get out of his vehicle several times. (*See* Gonzalez Dep. at 178:13–17; Torres Dep. at 215:2 to 217:4; Frazin Dep. at 39:2 to 40:5). The After Action report specifically indicates that two officers, Officer Phillip Frazin ("Frazin") and Officer Roberto Perez ("Perez"), approached the vehicle with their guns drawn and instructed Sosa to show his hands. (*See* After Action Report at 3; Torres Dep. at 217:3–21; Frazin Dep. at 39:2 to 40:5). Sosa refused to comply. (*See* After Action Report at 3; Torres Dep. at 217:3–21; Frazin Dep. at 39:2 to 40:5). Instead, he turned the volume of the car stereo up and attempted to put the vehicle in reverse. (*See* After Action Report at 3; Torres Dep. at 217:3–21; Frazin Dep. at 39:2 to 40:5).

Frazin opened the driver's side door and again asked Sosa to show his hands and step out of the vehicle. (*See* After Action Report at 3; Torres Dep. at 217:3–21; Frazin Dep. at 39:2 to 40:5). When Sosa failed to comply, Frazin reached into the car, grabbed Sosa by the shoulder, and guided him out of the vehicle. (*See* After Action Report at 3; Torres Dep. at 217:3–21). Perez assisted Frazin by grabbing Sosa's left arm and both officers guided him out of the vehicle and onto the ground. (*See* After Action Report at 3; Torres Dep. at 217:3–21). Perez restrained Sosa with flex cuffs and Sosa was remanded to the custody of Officer Kenneth Horgan. (*See* After Action Report at 3). According to Defendants, Gonzalez did not participate in Sosa's arrest. Torres filled out the arrest form for Sosa's detention, charging him with resisting arrest without violence. (*See* Compl./Arrest Aff. [D.E. 196–3]; Torres Dep. at 257:1–19).

## F. Missing $8,500

Sosa asserts that Gonzalez conducted a search of his car after his arrest. He claims $8,500 in cash were in a compartment of his vehicle before the search that were missing after the search was completed. (*See* Sosa Decl. ¶ 42). Sosa further states he witnessed Gonzalez search his car after his arrest and specifically saw Gonzalez in the area of his car where the money was kept. (*See* Sosa Dep. at 79:21 to 81:20). Hames confirms he saw Gonzalez search Sosa's car. (*See* Hames Dep. at 184:18–25). Sosa did not specifically see Gonzalez remove the money from his car. (*See* Sosa Decl. ¶ 42). Gonzalez denies searching Sosa's car or removing any money from the vehicle. (*See* Gonzalez Dep. at 215:22 to 216:2).

## G. Forfeiture Proceeding

Several months after the seizure of property from Sosa's home, a forfeiture hearing was held in state court. During a January 12, 2005 evidentiary hearing in that proceeding, the state court judge found there was sufficient probable cause to justify the seizure of $10,000 from Sosa's home. (*See* County Answer to Am. Compl., Ex. A [D.E. 95–2] at 36). The parties in that action, the Miami–Dade Police Department and Sosa, subsequently settled the forfeiture proceeding, entering into a stipulation of dismissal which was approved by the court. (*See id.,* Ex. C [D.E. 95–4]). The stipulation provided that $2,200 would be forfeited to the Miami–Dade Police Department and $7,800 would be released in cash to Sosa. (*See id.*

at 1). The stipulation further provided as follows:

> The Court finds that this dismissal is being ordered solely for the convenience of the Parties and preservation of judicial resources. The Final Order shall not operate as an admission or adjudication of any factual or legal issue with respect to any of the averments made in pleadings, or as an admission of guilt or liability by [the Parties] concerning any related factual or legal issues, and this Order shall not bar claims in other pending actions based upon the same nucleus of facts.

(*Id.,* Ex. C at 2).

## H. Amended Complaint

Sosa filed his Amended Complaint on May 1, 2006. In the Amended Complaint, Sosa alleges the actions of Officer Hames (Count I), Officer Torres (Count II), and Officer Gonzalez (Count III) deprived Sosa of his federally-protected constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Sosa seeks judgment under 42 U.S.C. § 1983. (*See* Am. Compl. ¶¶ 48, 51, 54). Defendants seek summary judgment on these counts on the ground of qualified immunity.

In Count VI of the Amended Complaint, Sosa asserts a claim under Section 1983 against the County, alleging that the County has policies of "failing to supervise, discipline, report, or investigate its officers for abusing their authority under color of law[;]" "*condoning unlawful acts*" such as those described in the Amended Complaint; and "trying to keep property illegally taken both by failing to return the property, failing to report adequately the property taken for identification . . . and in abusing the forfeiture process in an attempt to have citizens waive their rights to said property. . . ." (*Id.* ¶¶ 65–67). The County seeks summary judgment on the basis that no disputed issue of fact exists

concerning the existence of a County policy or custom.

## II. *LEGAL STANDARD*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.,* 894 F.2d 1555, 1558 (11th Cir.1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, "[t]he mere existence of a scintilla of evidence in support

of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505.

"For factual issues to be considered genuine, they must have a real basis in the record.... [M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir.2005). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.

Furthermore, "factual disputes do not preclude a grant of summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions. Thus, in the context of a § 1983 case, summary judgment would be appropriate as a matter of law, notwithstanding factual disputes on the record regarding the defendant's conduct." *Rich v. Dollar,* 841 F.2d 1558, 1564–65 (11th Cir.1988). However, "[i]f the legal norms allegedly violated were as a matter of law clearly established at the appropri-

ate time, a genuine fact issue as to what conduct the defendant engaged in would preclude a grant of summary judgment based upon qualified immunity." *Id.* at 1565.

## III. *ANALYSIS*

### A. Evidentiary Challenges

■ Before considering the parties' substantive arguments, Sosa raises various evidentiary challenges that may constrain which exhibits the Court may consider. First, Sosa asserts that Defendants failed to produce a second "redline report" which would have outlined the chronology of the investigation. (*See* Opp'n [D.E. 212] at 21–23). However, Sosa has failed to produce any evidence demonstrating the existence of such a report. No one claims that a second report was created or was even necessary in the course of the investigation. Indeed, Hames, who Sosa maintains created the second report, specifically denies that a second report exists. (*See* Decl. of Peter Hames [D.E. 219–2] at 1). There is no evidence that a second redline report ever existed and therefore no basis for the Court to conclude that Defendants have improperly withheld it.

■ Second, Sosa sought the County's file associated with the asset forfeiture proceeding regarding the seizure of $10,000 from Sosa's residence on October 5, 2004. (*See* Opp'n at 23). Portions of this file have apparently been misplaced since the file was created. (*See id.*). Although Defendants admit they have not produced the entirety of the asset forfeiture proceeding files, having deemed portions of the file privileged, Sosa fails to demonstrate how the missing portions might assist his claims. Indeed, as discussed *infra,* no claims related to the seizure of the $10,000 remain, and Sosa does not demonstrate how the forfeiture proceeding relates to any of his other claims.

Therefore, Sosa has not been prejudiced because the missing evidence would not reveal any pertinent facts in support of his claims. *Cf. Stanton v. Nat'l R.R. Passenger Corp.*, 849 F.Supp. 1524, 1528 (M.D.Ala.1994) (summary judgment denied where tape recording speed of train was improperly destroyed in case involving claim of excessive speed); *Morgan v. U.S. Xpress, Inc.*, No. 4:03–CV–88 (CAR), 2006 WL 1548029, at *4–*5 (M.D.Ga. June 2, 2006) (summary judgment denied where missing satellite positioning data would have revealed whether defendant-driver was involved in accident).

Third, Sosa asserts that Defendants' witnesses were unprepared or otherwise not forthcoming during their depositions. (*See* Opp'n at 24). Sosa complains that Officers Gonzalez, Frazin, and Lozano were unable to estimate the number of investigations or depositions they had participated in during their respective careers. (*See id.*) Sosa also complains of Officer Lazaro Aleman's faulty memory regarding the investigation. However, Sosa fails to explain how the officers' failure to adequately answer these particular questions has prejudiced him and why the County or the individual Defendants should be held responsible for Aleman's failure to prepare for his deposition. Further, Local Rule 26.1(H)(1) requires that all motions related to discovery be filed within thirty (30) days of the offending event, absent a showing of reasonable cause for late filing. Failure to timely file may constitute a waiver of relief. *See* Local Rule 26.1(H)(1). Officer Aleman's deposition was conducted in July 2007. Any objection to the witness's conduct at the deposition should have been timely raised over a year ago.

■ Finally, Sosa challenges the admissibility and credibility of the Investigative Report and the After–Action Report relied upon by Defendants. (*See* Opp'n at 25–

28). Notably, Defendants have produced additional evidence in support of many statements contained in the reports, including the deposition testimony of various individuals who witnessed the events described or were otherwise involved in the investigation. Where Sosa has produced evidence to rebut portions of these reports, the undersigned has appropriately noted the factual disputes. However, as Sosa has not directly rebutted many statements contained in the reports or otherwise challenged the veracity of those statements, Sosa's wholesale objection to the reports is unfounded. *See Taylor v. On Tap Unlimited, Inc.*, 282 Fed.Appx. 801, 801 (11th Cir.2008) (trial court did not make an inappropriate credibility determination by relying on unchallenged testimony of affiant to grant summary judgment); *Lundeen v. Cordner*, 354 F.2d 401, 409 (8th Cir.1966) (party opposing summary judgment has the burden to produce specific facts to challenge an affiant's credibility). Because Sosa has failed to raise any material fault with the Defendants' production of evidence, there is no basis to deny the Motion based on these limited evidentiary challenges.

## B. Qualified Immunity Standard

■ The individual Defendants, Hames, Gonzalez, and Torres, argue that they are entitled to qualified immunity from the claims asserted against them. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir.2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002)). In order to illustrate entitlement to the qualified immunity defense, a government official must demonstrate that the acts complained of were committed

within the scope of the officer's discretionary authority. *Id.* at 1232. Once the officer has done so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002); *see also McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir.2007).

 In order to prevent dismissal of his or her claims under the doctrine of qualified immunity, a plaintiff must first show that the facts, taken in the light most favorable to the plaintiff, demonstrate the defendant violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Sharp v. Fisher,* 532 F.3d 1180, 1183 (11th Cir. 2008); *McClish,* 483 F.3d at 1237. Even if the facts demonstrate a violation, the plaintiff still has the burden to show that the constitutional rights were "clearly established" at the time of the violation in order to survive summary judgment. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Sharp,* 532 F.3d at 1183; *McClish,* 483 F.3d at 1237. Decisions of the United States Supreme Court, the Eleventh Circuit, and the Supreme Court of Florida can clearly establish law in this jurisdiction. *McClish,* 483 F.3d at 1237. For the law to be "clearly established," it must be so clear that every objectively reasonable official understands it to prohibit the challenged act. *See Vinyard,* 311 F.3d at 1353. The purpose of this requirement is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151.

That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary. But in light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious. Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.

*Snider v. Jefferson State Community College,* 344 F.3d 1325, 1328 (11th Cir.2003).

In this case, it is undisputed that Hames, Gonzalez, and Torres were government officials performing discretionary functions at the time of the conduct at issue. Therefore, the burden shifts to Sosa to demonstrate that Defendants violated a clearly established statutory or constitutional right to overcome the qualified immunity defense. The Court considers each of the claims in turn.

### 1. *Alleged Constitutional Violations*

### a. *Illegal Search & Seizure Claims Against Hames (Count I)*

 The claims raised against Hames in the Amended Complaint are that the October 3, 2003 search of Sosa's business and the October 5, 2004 search of Sosa's residence were unlawful in violation of the Fourth Amendment, and that the seizure of property during each of these searches was unconstitutional.[2]

---

**2.** Sosa's Opposition argues for the first time that Hames' course of conduct throughout the investigation was an attempt to harass Sosa out of his livelihood, apparently in violation of the Commerce Clause. (*See* Opp'n at 29–30). As the claim was not raised in the Amended Complaint, it is untimely and the Court will not consider it. *See Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1314–15 (11th

Cir.2004) (plaintiff may not raise new claim for first time in summary judgment if not raised in complaint); *Hyland v. Sec'y for Dept. of Corrections,* No. 06–14455, 2007 WL 2445972, at *3 n. 1 (11th Cir. Aug.29, 2007) (malicious prosecution claim may not be raised for first time in response to summary judgment motion as proper procedure to assert new claim is to amend complaint).

i. October 3, 2003 search of Sosa's business

Florida Statute Section 812.055(1) permits any law enforcement officer "to inspect any junkyard; scrap metal processing plant; motor vehicle or vessel salvage yard; licensed motor vehicle or vessel dealer's lot; motor vehicle, vessel, or outboard repair shop; parking lot; public garage; towing and storage facility; or other establishment dealing with salvaged motor vehicle, vessel, or outboard parts." The only restrictions imposed upon an officer's ability to conduct an inspection are that it occur "during normal business hours" and "be for the purpose of locating stolen vehicles, vessels, or outboard motors; investigating the titling and registration of vehicles or vessels; inspecting vehicles, vessels, or outboard motors wrecked or dismantled; or inspecting records required in §§ 319.30 and 713.78." Fla. Stat. § 812.055(2).

 "[W]arrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials." *Donovan v. Dewey*, 452 U.S. 594, 599, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). However, "[t]he interest of the owner of commercial property is not one in being free from any inspections." *Id.* While a statute governing administrative inspections of businesses may not permit "unbridled discretion," where it is tailored to address specific concerns and provides sufficient predictability such that a business is on notice that it is subject to periodic inspection undertaken for specific purposes, "the assurance of regularity provided by a warrant may be unnecessary." *Id.* at 599–600, 101 S.Ct. 2534. The Florida Supreme Court evaluated Section 812.055 under this rubric and de-

termined the statute was reasonable under the Fourth Amendment because it was designed to address widespread motor vehicle theft and restricted inspections to businesses easily involved in the unlawful disposition of stolen vehicles. *See Moore v. State*, 442 So.2d 215, 216 (Fla. 1983).

 Sosa argues that the October 3, 2003 search of his business was unreasonable because Hames was motivated by ill will. He does not argue that the search was conducted in violation of the statute. Rather, Sosa admits that his business was subject to such searches, that the search was conducted during normal business hours, and that Hames did, in fact, conduct an inspection of his business records and vehicle inventory. Sosa offers no authority for his argument that Hames may be held liable for the search because he harbored malice while conducting an otherwise legal inspection pursuant to the statute. Sosa further provides no evidence that Hames was responsible for alerting the media to the search other than mere suspicion, nor does he demonstrate that such action would be unlawful had Hames actually done so. Sosa has failed to demonstrate the unconstitutionality of the October 3, 2003 search. Hames is therefore entitled to qualified immunity as to the events of October 3, 2003.

ii. October 5, 2004 search of Sosa's residence

With respect to the October 5, 2004 search, the Court has previously determined that Count I of the Amended Complaint alleges the officers misused the Warrant to cause unnecessary damage to Sosa's residence and steal his property. (*See* Oct. 25, 2007 Order [D.E. 171] at 5).

Hames does not dispute that damage was caused to the residence in the execution of the Warrant. However, he denies

he personally executed the Warrant or otherwise directed the officers who did so. Hames claims the SRT actually executed the Warrant at the request of Lieutenant T. Tate from the Economic Crimes Bureau. (*See* After Action Report at 2). Sosa has produced no evidence to demonstrate otherwise nor has he directed the Court to any case law holding an officer individually liable for damage caused to a residence under such circumstances. To the contrary, the cases relied upon by Sosa involve officers who directly participated in or directed an unlawful search. *See Duncan v. Barnes*, 592 F.2d 1336, 1338 (5th Cir.1979) (officer who led search of wrong residence liable where he did no appropriately verify address before invading home); *Hartsfield v. Lemacks*, 50 F.3d 950, 955–56 (11th Cir.1995) (same).

 Hames may nevertheless be liable for the damage caused by the search if, as Sosa asserts, Hames made material misstatements and omissions in the Affidavit supporting the Warrant. "A search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth ... and this rule includes material omissions." *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir.2002) (citations omitted). "Nonetheless, the warrant is valid if, absent the misstatements or omissions, there remains sufficient content to support a finding of probable cause." *Id.* (allegedly misstated or omitted facts did not alter determination that considering the "totality of the circumstances" there was a sufficient basis to believe violation of statute had occurred).

 Sosa has produced relevant evidence of one misstatement and one omission.[3] First, Sosa argues that Hames misstated the location of Accion's business records because he knew the documents were kept at the business location and not at Sosa's residence. According to the Affidavit, Sosa told Officer Reyes the business records were being kept at Sosa's residence. (*See* Oct. 4, 2004 Aff. for Search Warrant at 2). Although Sosa maintains he did not make any such statements to Officer Reyes, Hames was entitled rely upon statements made to him by another officer in drafting the Affidavit, even if it is ultimately discovered that Officer Reyes misstated the evidence. *See Rugendorf v. United States*, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964) (holding warrant not undermined and affiant did not act in bad faith where affiant relied upon erroneous statements made by third party); *United States v. Ventresca*, 380 U.S. 102, 107–111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (holding affiant entitled to rely upon observations of investigators as basis for probable cause for search warrant).

The Affidavit does not state that Sosa directly told Hames the business records were kept at his residence. Sosa therefore has the burden of producing evidence demonstrating that Hames knew the documents sought by the Warrant were kept at the business location or that Hames knew Officer Reyes was not being truthful. While Sosa affirmatively states the records were kept at his business (*see* Sosa Decl. at ¶ 34), he does not demonstrate that Hames or any of the other officers actually saw his business records at Accion during the September 28, 2004 search.[4] More

---

**3.** Sosa asserts that Hames mischaracterized two arrests (*see* Opp'n at 33), but Hames did not mention the arrests in the Affidavit supporting the Warrant. Sosa also maintains he never told Office Reyes that he kept motor vehicles at his residence (*see id.*), but again, these facts do not appear in the Affidavit.

**4.** Sosa's reliance on the affidavit of S. Allen Monello is unhelpful. According to his affidavit, Mr. Monello met with Sosa in May 2004 to review his business records at Accion. (*See* Aff. of S. Allen Monello [D.E. 213–15] ). Evidence that certain records were kept at the business several months before the search in

importantly, Sosa does not show that the particular certificates of destruction that Hames sought were located at his business or that Hames would have seen them during the search.

 Second, Sosa asserts Hames failed to disclose that he was involved in litigation with Sosa at the time the Warrant was issued. Sosa argues this information would have demonstrated Hames's bias which led him to fabricate various facts supporting the Warrant. Sosa does not disclose the nature of the litigation, its status at the time the Warrant was sought, or Hames's particular involvement, such that the purported bias can be evaluated. Sosa also does not argue that any statements contained in the Affidavit have been fabricated other than the location of his business records. Sosa has not cited, and the undersigned has not found, any authority holding that such knowledge (location of records) or bias by Hames (litigation) is sufficient to undermine an otherwise properly supported Warrant where the facts supporting probable cause are not directly challenged. As Sosa has failed to demonstrate how the misstatement or the omission undermine probable cause, no constitutional violation has been shown, and Hames is entitled to qualified immunity as to this claim.

iii. Unlawful seizures

 In the October 25, 2007 Order [D.E. 171] on Hames's Motion to Dismiss the Amended Complaint, the undersigned determined that Sosa's unlawful seizure claims would be "limited to those in which he asserts Hames actually stole property from Sosa's house and/or place of business

and kept the property for himself (as opposed to those claims in which Hames is alleged to have seized property on behalf of the police department, which then failed to return the property)." (*Id.* at 8). Sosa maintains the officers confiscated several forklifts, guns, money, and other personal effects during the two searches led by Hames. However, Sosa has failed to demonstrate that Hames confiscated any property on his own behalf and not on behalf of the department. Hames is entitled to qualified immunity with respect to claims stemming from the seizure of property in both searches, and therefore as to Count I in its entirety.[5]

b. *Unlawful Arrest Claim Against Torres and Gonzalez (Counts II & III )*

 Sosa's Amended Complaint asserts that his October 5, 2004 arrest was unreasonable in violation of the Fourth Amendment. "An arrest is quintessentially a seizure of the person, and therefore subject to the Fourth Amendment's reasonableness requirement." *McClish,* 483 F.3d at 1238 (citing *California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). An arrest conducted in a public place does not require a warrant, but must be supported by probable cause. *See id.* (citing *United States v. Watson,* 423 U.S. 411, 417 & n. 6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)).

A police officer is entitled to qualified immunity on a false arrest claim if he can establish that he had "arguable probable cause" for the arrest. *Jones v. Cannon,* 174 F.3d 1271, 1283 n. 3 (11th Cir.1999).

question does not create a triable issue that the documents were present when a search was conducted in late September or that the particular documents sought by the Warrant were ever kept at the business.

**5.** The Court has already determined that Sosa is foreclosed from pursuing a claim against Hames premised upon the unlawful seizure of motor vehicles during the January 8, 2004 search of Sosa's business. (*See* October 25, 2007 Order at 9).

Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest the [plaintiff]." *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir.1998) (internal quotation marks omitted).

 The "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *see also Lee*, 284 F.3d at 1195–96 (" '[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest' ") (quoting *Bailey v. Bd. of County Comm'rs of Alachua County*, 956 F.2d 1112, 1119 n. 4 (11th Cir.1992)). Nonetheless, the arrest must be "objectively reasonable based on the totality of the circumstances." *Lee*, 284 F.3d at 1195; *see also Devenpeck*, 543 U.S. at 153, 125 S.Ct. 588 ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.") (internal quotation and citations omitted). Further, "[t]he fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers." *Voorhees v. State*, 699 So.2d 602, 609 (Fla.1997) (citations omitted); *see also United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one

of their number."); *Illinois v. Andreas*, 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) ("[W]here law enforcement authorities are cooperating in an investigation ... the knowledge of one is presumed shared by all").

The stated basis for Sosa's October 5, 2004 arrest, according to the arrest report, is resisting arrest without violence. (*See* Compl./Arrest Aff.). Defendants argue that this and seven other grounds provided probable cause to arrest at the time of Sosa's detention, each of which will be addressed in turn.

#### i. Circumstances of the Arrest

The first three grounds for probable cause which Defendants offer are all related to the circumstances surrounding Sosa's arrival at his residence on October 5, 2004, while the search was ongoing. Defendants maintain Sosa crossed a police line, disobeyed commands from an officer, and resisted arrest. These factual assertions have all been disputed by Sosa, who claims in a sworn declaration that he drove up to his home,[6] parked his car, and was immediately dragged from his vehicle and arrested without even an opportunity to resist. Viewing these disputed facts in the light most favorable to Sosa, an arrest was not justified on any of these bases.

#### ii. Search Warrant

 Defendants next argue that the Warrant itself provides a basis for Sosa's arrest. The Warrant states there is probable cause to believe Sosa's house contains "a weapon, instrumentality, or means by which a felony ... has been committed" and that the premises are being used to

---

**6.** Defendants argue that statements made by Sosa in deposition contradict his assertion that he did not cross a police line when arriving at his residence. (*See* Reply [D.E. 216] at 14). Notwithstanding Defendants' interpretation of the deposition testimony, Sosa's own statements create an issue of fact regarding where the police vehicles were parked at the time Sosa pulled his car up to the residence. (*See* Sosa Dep. at 23:2–24:1).

commit, or had been used to commit, a felony. (Oct. 4, 2004 Search Warrant at 1–2). The Warrant does not specifically authorize Sosa's arrest, but the officers executing the Warrant were instructed by its text "to arrest all persons in the *unlawful* possession" of the property sought in the Warrant. (Oct. 4, 2004 Search Warrant at 2) (emphasis added). The property sought in the Warrant is described as "any and all records pertaining to the purchase, sale or acquisition of, or disposal of any motor vehicle, any and all documentation written or computer generated including computer files and programs, any and all financial records *relating to offenses involved in grand theft, forgery, offenses involving vehicle identification numbers, applications, and certificates."* *(Id.)* (emphasis added).

Defendants assert that two particular items found during the search fall under the definition of property authorized by the Warrant: (1) towing tickets issued to Accion dating to 2003; and (2) three open Florida motor vehicle titles. Defendants do not explain how the towing tickets from 2003 fall within those documents authorized by the Warrant or in any way pertain to a crime of the sort described in the Warrant. Defendants further fail to explain how mere possession of open titles relates to the forged certificates of destruction the officers were investigating or one of the offenses described in the Warrant, especially considering that Sosa was a licensed motor vehicle dealer likely to be in lawful possession of such titles. Therefore, even assuming that the Warrant may be used to establish arguable probable cause for an arrest, there is simply no basis from the language of the Warrant or the Affidavit in support from which a reasonable officer could conclude there was arguable probable cause to arrest Sosa based on the handful of documents discovered in his residence.

### iii. Open Motor Vehicle Titles

Defendants assert that Sosa's possession of open titles to three vehicles was in violation of Florida law, providing probable cause to arrest. Florida Statute Section 319.22(5) makes it "illegal to transfer title to a motor vehicle when the purchaser's name does not appear on the title. Any buyer or seller who knowingly and willfully violates this subsection with intent to commit fraud commits a misdemeanor of the first degree...." Florida Statute Section 319.21(3) provides that a licensed dealer "may, in lieu of having a certificate of title issued in the dealer's name, reassign any existing certificate of title." Hames argues that even if Sosa, as a licensed dealer, was permitted to reassign existing titles without having them issued in his own name, Sosa was required to immediately transfer the titles once in his possession, rather than hold open titles until they were transferred at some later date. These statutes do not explicitly establish this requirement, and Defendants have not provided any case law interpreting the statutes to include such a requirement.

Defendants also argue that since Sosa claims the three vehicles were intended for personal use rather than business purposes, Sosa's possession of the open titles violated Section 319.22(5). This argument fails as well because no evidence has been presented that Defendants were aware of Sosa's intended use of the three vehicles at the time of the arrest. Defendants have therefore failed to demonstrate that probable cause existed to arrest Sosa because he held open motor vehicle titles.

### iv. Maintenance of Records at Place of Business

Defendants next argue the documents discovered at Sosa's residence were required to be maintained at the business

offices of Accion. Florida Statute Section 319.30(8)(b) requires that "salvage motor vehicle dealers shall keep all certificates of destruction, seller's affidavits, and all other information required by this section to be recorded or obtained, on file in the offices ... for a period of 3 years from the date of purchase of the items reflected in such certificates of destruction or seller's affidavits." Subsection (2) specifically requires that proper certificates of title accompany motor vehicles sold, transported, or delivered to the dealer, and these documents are therefore required to be maintained at the dealer's business offices pursuant to subsection (8)(b). *See Reynolds v. State,* 383 So.2d 228 (Fla.1980) (holding statute requiring dealers to keep records of all motor vehicles acquired as junk is lawful). Violation of this section is considered a felony of the third degree. Fla. Stat. § 319.30(9).

Section 319.30 does not address the retention requirements of towing receipts like those found in Sosa's residence. Nevertheless, Defendants could have reasonably believed the three open titles discovered in Sosa's home were records related to Accion (as opposed to titles to vehicles acquired for personal use) and consequently documents required to be kept at Accion's business offices pursuant to this statute. Gonzalez and Torres had arguable probable cause to arrest Sosa for violation of this statute because a reasonable officer possessing their knowledge would have reason to believe Sosa violated the statute.

v. Forged Certificates of Destruction

Defendants' last two grounds for probable cause are related. Defendants assert that (1) Sosa was in possession of forged certificates of destruction and (2) Sosa transferred vehicles with forged certificates of destruction to U–Pull–It in violation of Florida law. Defendants rely on Florida Statute Sections 831.01 and 831.02

as their bases for probable cause to arrest. Florida Statute Section 831.01 makes it a felony to falsely make, alter, forge, or counterfeit "a public record, or a certificate, return or attestation of any clerk or register of a court, public register, notary public, town clerk or any public officer, in relation to a matter wherein such certificate, return or attestation may be received as a legal proof; or a charter, deed, will, testament, bond, or writing obligatory, letter of attorney, policy of insurance, bill of lading...." Florida Statute Section 831.02 similarly makes it a felony to "utter[ ] and publish[ ] as true a false, forged or altered record, deed, instrument or other writing mentioned in § 831.01 knowing the same to be false, altered, forged or counterfeited, with intent to injure or defraud any person."

█ With respect to Defendants' first probable cause argument, neither statute makes mere possession of a forged instrument criminal, and Defendants have not claimed that Sosa forged the certificates of destruction himself. Indeed, at the time Sosa's residence was searched, Hames had already secured an admission that Galan at Diaz Towing had forged the documents.

█ Defendants did, however, have evidence suggesting that Sosa passed forged certificates of destruction when he sold vehicles purchased from Diaz Towing to U–Pull–It. Officers had determined that Galan had forged certificates of destruction for numerous vehicles which he then sold to Accion. Officers further determined U–Pull–It had purchased twenty-nine cars from Accion with forged certificates of destruction. Although Defendants did not have evidence that Sosa knew the certificates of destruction were forged, such evidence is not required to establish probable cause to arrest under the circumstances. "Arguable probable cause does not require an arresting officer to prove

every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles,* 245 F.3d 1299, 1302–03 (11th Cir.2001) (evidence of knowledge unnecessary for arguable probable cause where officer had evidence that arrestee had sold merchandise that infringed on trademark). It is enough that the officers had identified the forged certificates and identified that Sosa had passed them to U–Pull–It. *See United States v. Everett,* 719 F.2d 1119, 1120 (11th Cir.1983) ("The passing of a counterfeit note coupled with an identification of the person who passed the note furnishes probable cause to arrest the individual identified as passing the note.").

There is sufficient evidence to establish arguable probable cause to arrest Sosa for having passed forged certificates of destruction to U–Pull–It. As Sosa has not demonstrated a constitutional violation with respect to probable cause to arrest, Gonzalez and Torres are entitled to qualified immunity with respect to this claim.

### c. *Excessive Force Claim Against Torres and Gonzalez (Counts II & III )*

Sosa argues that even assuming there was probable cause to initiate an arrest, the officers used excessive force in detaining him. Although Sosa's Amended Complaint identified Torres and Gonzalez as the two officers executing the arrest, Sosa's Opposition to the present Motion only identifies Gonzalez by name as having participated directly in Sosa's physical arrest.[7] Therefore, Torres is entitled to summary judgment as to the claim of excessive force and as to Count II in its entirety.

Sosa describes the force used in the arrest to include the following actions: (1) officers pointed their weapons at Sosa while he was in his vehicle; (2) Gonzalez pulled Sosa from his vehicle; (3) Gonzalez threw Sosa to the ground face down; and (4) officers began to hit and kick him. (*See* Sosa Decl. ¶ 40). Sosa asserts the SRT officers, whom he describes as the "officers in black," pointed guns at him while Gonzalez was in plainclothes. (*See* Opp'n at 14; Sosa Decl. ¶ 40). Sosa fails to assert that Gonzalez was one of the officers who began to hit and kick him once he was removed from the vehicle.[8] Therefore, the only behaviors attributable to Gonzalez are that he pulled Sosa from his car and threw him to the ground before arresting him.

---

**7.** Sosa now states that Hames was involved in Sosa's physical arrest; this claim does not appear in the Amended Complaint. To the extent Sosa now attempts to make unlawful arrest and excessive force claims against Hames, such claims are foreclosed on summary judgment. *See supra* at 16 n. 2; *Gilmour,* 382 F.3d at 1314–15; *Hyland,* 2007 WL 2445972, at *3 n. 1.

**8.** Sosa does not specifically assert in his Opposition that Gonzalez hit and kicked him after he was removed from his car. Even if Sosa's declaration could be so construed, Sosa's Amended Complaint did not allege that any officers engaged in such a physical assault. Heightened specificity is required in pleadings stating civil rights actions against public officials who may be entitled to qualified immunity. *See Maldonado v. Snead,* 168 Fed.Appx. 373, 379 (11th Cir.2006). The complaint must allege the relevant facts with some specificity. *Id.* Conclusory or vague allegations are insufficient. *Id.* at 379–80. Claims should be pleaded " 'with sufficient precision to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds.' " *Schlotter v. Walsh,* No. 6:05CV277ORL–22KRS, 2005 WL 1051183, at *2 (M.D.Fla. April 28, 2005) (quoting *Brown v. Frey,* 889 F.2d 159, 170 (8th Cir. 1989)).

■ "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee,* 284 F.3d at 1197. In evaluating an excessive force claim under the Fourth Amendment, the court must inquire "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citations omitted). The reasonableness analysis requires careful consideration of a number of factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865.

■ Under Florida law, officers are permitted to make a full custodial arrest whether the offense is a felony or a misdemeanor. *See Durruthy v. Pastor,* 351 F.3d 1080, 1093 (11th Cir.2003) (citing Fla. Stat. § 901.15(1)). The Fourth Amendment permits law enforcement officers "to use some degree of physical coercion or threat thereof to effect" an arrest. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. "[T]he use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." *Lee,* 284 F.3d at 1200. Therefore, "the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v.*

*Isbell,* 207 F.3d 1253, 1257 (11th Cir.2000). "[Q]ualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." *Lee,* 284 F.3d at 1200.

Courts have held a variety of behaviors to be reasonable in executing an arrest. For example, in *Durruthy,* the officers grabbed the plaintiff from behind and pulled him onto the ground while struggling to pin his arms behind him. 351 F.3d at 1085. During the struggle, one officer kneed the arrestee in the back and another held him down with her hands while he was handcuffed. *Id.* In *Nolin,* an officer grabbed the plaintiff from behind by his shoulder and wrists, threw him against a van three or four feet away, kneed him in the back, pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him. 207 F.3d at 1255. The plaintiff suffered bruising to his forehead, chest, and wrists, although he did not seek medical treatment. *See id.* In *Jones v. City of Dothan, Alabama,* officers slammed the arrestee against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket, tearing his pants and scattering the contents of the wallet on the ground. 121 F.3d 1456, 1458 (11th Cir.1997). *Cf. Lee,* 284 F.3d at 1199 (finding officer acted unreasonably when he slammed arrestee's head against trunk of car after she was already arrested and secured in handcuffs).[9]

■ The Court cannot say that Gonzalez acted unreasonably under the circum-

---

9. The only cases relied on by Sosa in support of his excessive force claim involve circumstances where the officers had no probable cause to arrest, in which case the use of any force would be unreasonable. *See Thornton v. City of Macon,* 132 F.3d 1395, 1400 (11th Cir.1998) ("Under the circumstances, the officers were not justified in using *any* force, and

a reasonable officer thus would have recognized that the force used was excessive.") (emphasis in original); *Bashir v. Rockdale County, Ga.,* 445 F.3d 1323, 1331–33 (11th Cir.2006) (same). Because the officers had probable cause to arrest Sosa, these cases are inapposite.

stances. Although Sosa may have been injured during the arrest, the act of pulling Sosa from the car and throwing him to the ground before handcuffing him is less severe than other behavior the Eleventh Circuit has determined to be reasonable and *de minimis.* Sosa has again failed to establish a constitutional violation, and Gonzalez is therefore entitled to qualified immunity as to the claim of excessive force.

#### d. *Illegal Seizure Claim Against Gonzalez (Count II)*

Sosa further maintains Gonzalez removed $8,500 from his vehicle at the time of the arrest and that this constitutes an illegal seizure in violation of the Fourth Amendment.[10] Gonzalez raises the same arguments previously addressed by the Court in the August 20, 2007 Order [D.E. 130] on Gonzalez's Motion to Dismiss the Amended Complaint. First, Gonzalez relies on the stipulation of dismissal agreed to by the parties in the forfeiture hearing in state court, which he asserts bars Sosa from raising allegations with respect to the missing $8,500. The Court has already determined that the language of the stipulation does not constitute a bar to the present action. (*See* August 20, 2007 Order at 11–12).

Second, the undersigned rejected Gonzalez's argument that the *Rooker–Feldman* doctrine [11] precludes Sosa from challenging the seizure of his property because there was no final state court judgment determining the issues litigated in this action nor are the claims raised here "inextricably intertwined" with the state court judgment. (*See id.* at 12–13). Finally, the *Parratt–Hudson* doctrine [12] does not apply because Sosa does not assert a procedural

due process violation, but an unlawful seizure under the Fourth Amendment. (*See id.* at 9–10). Sosa argues that Gonzalez's actions in seizing his property deprived him of his constitutional rights, notwithstanding any state law remedies.

■ The remaining question is whether the evidence presented, viewed in the light most favorable to Sosa, would support a jury verdict against Gonzalez with respect to the seizure. Although Gonzalez disputes that he even conducted a search of the car, let alone removed the $8,500 from the vehicle, Sosa stated in his sworn declaration that he witnessed Gonzalez in and about his car at the time of his arrest, a fact Hames has corroborated. Sosa specifically claims he saw Gonzalez reaching in the vehicle where the money was stowed and placing something in his pocket. The money was missing after these events. Whether Gonzalez took the money is a factual dispute to be resolved by the jury.

■ The Fourth Amendment protects individuals' possessory interests in property as well as their expectation of privacy. *See Soldal v. Cook County, Illinois,* 506 U.S. 56, 63, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (citation omitted). "[T]he absence of a privacy interest notwithstanding, '[a] seizure of the article ... would obviously invade the owner's possessory interest.'" *Id.* at 66, 113 S.Ct. 538 (quoting *Horton v. California,* 496 U.S. 128, 134, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). A "seizure" of property occurs when "'there is some meaningful interference with an individual's possessory interests in that property.'" *Id.* at 61, 113 S.Ct. 538 (quoting *United States v. Jacob-*

---

**10.** The Court has already determined that Sosa may not premise his claims against Gonzalez on an alleged illegal search of his car. (*See* August 20, 2007 Order at 9).

**11.** *Dist. of Columbia Ct. of Appeals v. Feldman,* 460 U.S. 462, 486, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

**12.** *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

*sen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)).

 Ordinarily, a seizure of personal property is *per se* unreasonable within the meaning of the Fourth Amendment unless accomplished pursuant to a warrant. *See Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). In the absence of consent or a warrant, "such seizures can be justified only if they meet the probable cause standard." *Soldal,* 506 U.S. at 66, 113 S.Ct. 538 (citing *Arizona v. Hicks,* 480 U.S. 321, 326–27, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)); *see also McArthur,* 531 U.S. at 330–31, 121 S.Ct. 946 (seizure reasonable where officers who retrained homeowner from entering trailer pending issuance of warrant had probable cause to believe home contained illegal drugs).

Gonzalez argues that any seizure of the $8,500, if it occurred, would have been authorized by the Warrant. But Gonzalez cites to no law or language from the Warrant itself supporting such a position. Sosa argues that the money was unlawfully seized by Gonzalez for his personal use, rather than as part of the investigation. Gonzalez's act of taking the money for his personal use—if shown—would be outside the authority given by the Warrant and is *per se* unreasonable in violation of the Fourth Amendment.

### 2. Clearly Established Law

 Having determined that a triable issue exists concerning whether Gonzalez took the $8,500 from Sosa's vehicle in violation of the Fourth Amendment, the next issue is whether the law establishing such a violation was clearly established. The critical inquiry is whether the law provided Gonzalez with "fair warning" that his conduct violated the Fourth Amendment. *See McClish,* 483 F.3d at 1248. In other words, the law must have been in effect at the time of the alleged violation and must have been clearly established such that "a reasonable official would understand that what he is doing violates the right." *Rioux v. City of Atlanta, Georgia,* 520 F.3d 1269, 1282 (11th Cir.2008) (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151). As discussed, the seizure (and retention) of personal property absent consent, a warrant, or probable cause is *per se* unreasonable in violation of the Fourth Amendment. This law was clearly established by the Supreme Court well before the October 5, 2004 search. *See McArthur,* 531 U.S. at 330, 121 S.Ct. 946; *Soldal,* 506 U.S. at 66, 113 S.Ct. 538. Therefore, Gonzalez is not entitled to qualified immunity with respect to the claimed seizure of the $8,500.[13]

### C. Section 1983 *Monell* Claims Against Miami–Dade County (Count VI)

 Sosa asserts a claim under Section 1983 against the County on the theory of municipal liability pursuant to *Monell v. Dep't of Social Serv. of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality cannot be held liable under Section 1983 based on the doctrine of respondeat superior. *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018; *Grech v. Clayton County, Ga.,* 335 F.3d 1326, 1329 (11th Cir.2003). A municipality may only be held liable where an "official policy" causes a constitutional violation. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Grech,* 335 F.3d at 1329. "The 'official policy' requirement was intended to distin-

---

**13.** Additionally, theft is illegal pursuant to Florida Statute Section 812.014. Even if Gonzalez's seizure was not a constitutional violation or the law was not clearly established, if Gonzalez took the money for his personal use it would violate clearly established statutory law. This would also defeat qualified immunity. *See Kingsland,* 382 F.3d at 1231.

guish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

 In order to establish a county's policy, a plaintiff must identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county. *See Grech*, 335 F.3d at 1329 (citing *Monell*, 436 U.S. at 690–91, 694, 98 S.Ct. 2018). "Because a county rarely will have an officially-adopted policy of permitting a particular constitutional violation," most plaintiffs must demonstrate the latter. *Id.* at 1330. "Under either avenue, a plaintiff (1) must show that the local governmental entity ... has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Id.* Sosa does not dispute that the final policymaking authority for Miami–Dade County rests with the Board of County Commissioners ("Board") and the County Manager. *See Moore v. Miami–Dade County*, 502 F.Supp.2d 1224, 1230 n. 4 (S.D.Fla. 2007); *Wilson ex rel. Estate of Wilson v. Miami–Dade County*, No. 04–23250–CIV–Moore, 2005 WL 3597737, at *8–*9 (S.D.Fla. Sept.19, 2005); *Buzzi v. Gomez*, 62 F.Supp.2d 1344, 1359–60 (S.D.Fla.1999).

The Amended Complaint does not identify what County policy Sosa seeks to challenge, and the Court previously acknowledged that Sosa would bear a heavy burden to support his municipal liability claim at summary judgment. (*See* August 20, 2007 Order at 14 n. 7). Sosa now identifies four policies that he maintains

caused the constitutional violations at issue.

 The first policy is not clearly stated, but the Court surmises that Sosa claims the County has a policy of unreasonably executing search warrants and arrests. Sosa relies only on the October 5, 2004 events at his residence in support of this claim, arguing that the sheer number of officers involved in the search and the number of egregious acts that occurred provide a sufficient basis to infer an official policy. Sosa cites only one case, *Grandstaff v. City of Borger, Texas*, 767 F.2d 161 (5th Cir.1985), in support of his argument. In *Grandstaff*, the court determined that official policy could be inferred from events occurring over the course of one night where the entire police staff of the town (six officers) engaged in repeated acts of abuse in several episodes that resulted in the death of an innocent man. *Id.* at 171. These events tended to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom. *Id.*

Courts that have subsequently evaluated *Grandstaff* have been reluctant to extend that court's application of *Monell* liability in the absence of extraordinary and egregious circumstances. *See, e.g., Snyder v. Trepagnier*, 142 F.3d 791, 797–98 (5th Cir. 1998) (refusing to find "extraordinary factual circumstances" in support of claim that police department enforced a "code of silence" where officer shot plaintiff from behind while pursuing him); *Young v. Eslinger*, No. 6:04–cv–1830–Orl–31KRS, 2006 WL 2854997, at *4 (M.D.Fla. Sept.29, 2006) (holding two-and-a-half hour search of car and persons at traffic stop allegedly made without probable cause was not such egregious wrongdoing that official policy could be inferred); *Daniel v. City of Tampa, Fla.*, No. 93–186–CIV–T–17C, 1995 WL 17064337, at * 10–* 11 (M.D.Fla.

Feb.24, 1995) (refusing to extend *Grandstaff* where protesters argued their arrests violated First Amendment, finding that a minority of officers were involved and actions were not egregious). Sosa has failed to present evidence that the officers executing the warrant at his home acted in an extraordinary or egregious manner such that the events of that single day can support the inference of official policy.

Second, Sosa maintains the County had a policy of seizing guns during the execution of search warrants. Sosa relies on the testimony of Hames and Sergeant Milton Hall, each having stated that he believes a written policy exists requiring the seizure of guns and large sums of money during searches for purposes of safekeeping (*see* Hames Dep. at 174:7–13; Dep. of Milton Hall [D.E. 213–6] at 106:16–21, 112:11–113:12). Hames and Hall do not identify what government officials authored or approved of this apparent policy.

In order to prove the policy is "official," thereby subjecting the County to liability, Sosa bears the burden of demonstrating that the policy was promulgated by the Board or County Manager, as the final policymakers for the County. Reference to these men's testimony does not satisfy that burden. *See, e.g., Wilson,* 2005 WL 3597737, at *8–*9 (holding that director of police department does not have final policymaking authority in Miami–Dade County despite having some discretionary authority); *Buzzi,* 62 F.Supp.2d at 1359–60 (same). Without producing evidence as to the source of the policy, there is an insufficient basis to support *Monell* liability. Sosa further fails to produce any other examples of such seizures, known to and approved by the Board or the County Manager, which would otherwise demonstrate the existence of a custom or practice.

Third, Sosa asserts that the County has a policy of delaying disciplinary investigations. In *Black v. Stephens,* a case cited by Sosa, the defendant-city had a written policy of unreasonably delaying disciplinary investigations of an officer's conduct until the underlying arrest was resolved. 662 F.2d 181, 189–90 (3d Cir. 1981). Unlike the situation in *Black,* Sosa has not identified a written policy of the County. Hall, who was investigating Sosa's claims against Hames, specifically testified there is no official policy of delay and that he acts on a case-by-case basis. (*See* Hall Dep. at 161:21–162:9). Sosa has not produced evidence of such a policy other than the apparent delay in this case. The County cannot be held liable under *Monell* for any unreasonable delay occasioned by Hall or his colleagues.

Fourth, Sosa seems to argue that the County has a policy of not responding to complaints of officer misbehavior and that pursuant to this policy, the County failed to act when informed that Hames was harassing Sosa. Again, Sosa has failed to demonstrate that the County acted according to an official policy or custom when the police department failed to remove Hames from the investigation. Indeed, Sosa admits an internal investigation was instituted, even if he believes it was not handled expeditiously. Further, Sosa has failed to demonstrate that Hames's actions constituted a constitutional violation and that the County was in any way obligated to remove Hames from the investigation.

Sosa has failed to produce evidence of any official policy which would justify a *Monell* claim against the County. The County is therefore entitled to summary judgment as to Count VI.

## IV. CONCLUSION

Consistent with the foregoing analysis, it is

ORDERED AND ADJUDGED that the Motion for Summary Judgment [D.E. 192] is **GRANTED–IN–PART** and **DENIED–IN–PART.**