Lazaro **SANCHEZ, Plaintiff,**

v.

Jimmy **OBANDO–ECHEVERRY and Miami–Dade County, Florida, Defendants.**

Case No. 09–21743–CIV–MARTINEZ–BROWN.

United States District Court, S.D. Florida, Miami Division.

March 31, 2010.

Gregory Richard Barthelette, William Robert Scherer, III, Conrad & Scherer, LLP, Fort Lauderdale, FL, for Plaintiff.

Brenda Kuhns Neuman, Michael Brian Nadler, Miami, FL, William Robert Scherer, III, Conrad & Scherer, Fort Lauderdale, FL, for Defendants.

### ORDER GRANTING DEFENDANT MIAMI–DADE COUNTY'S MOTION FOR SUMMARY JUDGMENT

JOSE E. MARTINEZ, District Judge.

THIS CAUSE came before the Court upon the Motion for Summary Judgment filed by Defendant, Miami–Dade County (**D.E. No. 61**). After careful consideration, the Court GRANTS Defendant's motion for summary judgment.

### I. PROCEDURAL HISTORY

Plaintiff, Lazaro Sanchez, is a construction worker who was hired to replace a homeowner's exterior window. While per-forming the repair on the morning of November 2, 2006, he was mistaken for a burglar by a neighbor who reported him to the police. Jimmy Obando–Echeverry,[1] who is named as a co-defendant in this case and who is employed by Defendant Miami–Dade County, was the first police officer to arrive at the scene. Plaintiff alleges that he was injured when he was handcuffed and, therefore, he sued Officer Obando under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from excessive force (Count I), and he sued Miami–Dade County for battery under State law (Count II) (Compl., D.E. No. 1).

Since Defendants raised a qualified immunity defense that applied to Officer Obando only, Plaintiff's two claims have proceeded on somewhat different tracks. The Court denied Officer Obando's motion to dismiss on qualified immunity grounds because the allegations, when construed in the Complaint in the light most favorable to Plaintiff, could reasonably lead to the conclusion that Officer Obando used excessive force by sneaking up on Plaintiff and tackling him for no reason without providing any notice or warning whatsoever.[2] Plaintiff appealed this decision, and the Court stayed the case as to Officer Obando until the resolution of the appeal, which remains pending before the Eleventh Circuit.

The Court did not stay the case as to Defendant Miami–Dade in order to, among

---

1. The undersigned notes that Defendants have repeatedly pointed out that the Complaint and Summons (and, therefore, the heading of most Court documents filed thereafter) incorrectly identify Jimmy Obando–Echeverry as "James." Because Defendants, in their motion for summary judgment, refer to him as "Officer Obando," the undersigned will also refer to him that way in this Order.

2. The Complaint merely alleged that Plaintiff "hear[d] *someone* behind him say *something* which he *believed* to be [in] English," but does not suggest that Officer Obando tried to address the situation in any way other than by "violently grabbing" Plaintiff and "thr[owing] him to the ground" (D.E. No. 1 at 9–10, ¶¶ 12–13) (emphasis added). The facts the Court is considering at summary judgment differ from the allegations in the Complaint, however.

other things, address the instant motion for summary judgment, which is now ripe for adjudication. With a more complete record, it is now apparent that Officer Obando did, in fact, alert Plaintiff to his presence and Plaintiff failed to respond. The question that remains is whether viewing the undisputed facts from the perspective of a reasonable officer in Officer Obando's perspective indicates that Officer Obando clearly used an excessive amount of force as a matter of law in effectuating Plaintiff's arrest. The undersigned finds that no reasonable factfinder could conclude that an excessive amount of force was used in the course of arresting Plaintiff, based on the circumstances at the time of the arrest. Therefore, no battery occurred and it is appropriate to enter summary judgment in favor of Miami–Dade as to Count II of the Complaint.

## II. *LEGAL STANDARDS*

### A. *Summary Judgment*

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue *of material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for

the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita Electric Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. It is "material" if it might affect the outcome of the case under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In addition, in considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. *Id.* at 255, 106 S.Ct. 2505.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties,* 941 F.2d 1428, 1438 (11th Cir.1991). The moving party " 'must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.' " *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.' " *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties,* 941 F.2d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991)). *See also* Fed.R.Civ.P. 56(e).

In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. When the non-moving party bears the burden of proof, the moving party does not have to

"support its motion with affidavits or other similar material *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. 2548 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 324, 106 S.Ct. 2548. Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must "go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R.Civ.P. 56(e)). A non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

### B. *Battery by Police During Arrest*

■ As the Eleventh Circuit Court of Appeals has succinctly stated, "[p]ursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is 'clearly excessive.'" *Davis v. Williams,* 451 F.3d 759, 768 (11th Cir.2006) (quoting *City of Miami v. Sanders,* 672 So.2d 46, 47 (Fla. 3d DCA 1996)). In other words, "[i]f an officer uses excessive force, the 'ordinarily protected use of force is transformed into a battery.'" *Id.* (quoting *Sanders,* 672 So.2d at 47) (ellipses omitted). Courts, however, should not "use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act." *Rodriguez v. Farrell,* 280 F.3d 1341, 1352–53 (11th Cir. 2002). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). It is well established that "the typical arrest involves some force and injury." *Rodriguez,* 280 F.3d at 1352 (citing *Nolin v. Isbell,* 207 F.3d 1253, 1257–58 (11th Cir. 2000)).

### III. *FACTUAL BACKGROUND*

The facts of this case as set forth below are not disputed, unless otherwise noted.

On November 2, 2006, Miami–Dade police officers responded to an emergency dispatch describing a burglary of a residence in progress in a high-burglary area. When the officers arrived at the address identified by the dispatcher, they observed Plaintiff, who was wearing the clothing described by the dispatcher and who appeared to breaking into the house through the window as depicted by the dispatcher (Deft.'s Statement of Material Facts ("SOF"), D.E. No. 61 at 1–2, ¶¶ 1–4); (Pltf.'s Response to SOF ("RSOF"), D.E. No. 65 at 1, ¶¶ 1–4).

Although the parties do not mention it in their briefs or their respective statements of fact, the undersigned notes that the house was near a school (Dispatch Information Report, D.E. No. 61, Ex. 1 at 2) (identifying location as a "res[idence] on corner n[e]xt to a school") (original in all capital letters); (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 104, 111–13) (noting that there were school signs near the house, that there were children walking along the sidewalk in front of the house when he went there a previous day to measure the window before returning to repair it, and that a crossing guard was positioned on the sidewalk on the same side of the street as the house, less than 100 feet away from the window on the day that he was doing the repair). Moreover, the incident oc-

curred during school hours, between approximately 8:30 and 9:30 a.m. (Dispatch Information Report, D.E. No. 61, Ex. 1 at 2).[3]

Moreover, there were no obvious signs that maintenance or repair work was being done on the property, as Plaintiff's van did not have any signs or lettering to indicate that it was a work van and Plaintiff was not wearing any uniform or tool belt of any kind, but instead only had loose tools (SOF, D.E. No. 61 at 2, ¶ 8); (RSOF, D.E. No. 65 at 3, ¶ 8). These tools are the focus of some factual disputes between the parties, including whether the tools were visible to the officers and whether they could have been viewed as potential weapons or projectiles. These questions, however, are not germane to the Court's ultimate resolution of this motion. For these purposes, the undersigned simply emphasizes that, taking the facts in the light most favorable to Plaintiff, the position of Plaintiff's tools at the time of his arrest would not indicate to a police officer whether Plaintiff was a repairman or a burglar, to the extent that they were visible to the police at all.

Plaintiff was facing the house with his hands the window and had his back turned to the police as Officer Obando approached him (SOF, D.E. No. 61 at 2, ¶¶ 4–5); (RSOF, D.E. No. 65 at 1, ¶¶ 4–5). Though there is some dispute as to what exactly was said, there is no dispute that Officer Obando said something to Plaintiff, and that Plaintiff was aware that Officer Obando was speaking to him. Plaintiff, however, did not respond in any way, and did not even turn around because he was unaware that Officer Obando was a police officer (SOF, D.E. No. 61 at 2, ¶ 6); (RSOF, D.E. No. 65 at 1, ¶ 6).

As Plaintiff describes it in his deposition, Officer Obando then grabbed Plaintiff's right wrist (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 115–16). He then pulled his arm up by the wrist (*id.* at 118), "turned [Plaintiff] around and threw [him] on the ground," while still "pulling [his] a[r]m" (*id.* at 117–18).[4] At that point, Plaintiff testified that he told Officer Obando "[t]o stop twisting my arm because you are going to break it" (*id.* at 118). As Plaintiff recalls, Officer Obando "continued pulling up the arm. And he broke my arm. And he ruins my arm" (*id.*). A second officer, Doby Lester, may have assisted in handcuffing Plaintiff as he was lying face down in the grass, but was not involved in tackling Plaintiff (SOF, D.E. No. 61 at 2–3, ¶ 10); (RSOF, D.E. No. 65 at 3, ¶ 10).[5]

After Plaintiff was handcuffed, the officers helped him stand up and soon discovered that Plaintiff was hired to replace the homeowner's window. The handcuffs were immediately removed. Plaintiff spent no more than two minutes total in the hand-

---

**3.** November 2, 2006 falls on a Thursday and, in addition to the fact that there was a crossing guard on duty, there is no indication that school would not have been in session that day.

**4.** The "ground" was grass, not concrete or asphalt (SOF, D.E. No. 61 at 2, ¶ 9); (RSOF, D.E. No. 65, at 3, ¶ 9).

**5.** Plaintiff stated in his deposition that Officers Obando and Lester "were also hitting [him] on the back ... [n]ot very hard ... [w]hile they were in the process of putting the handcuffs on [him]" (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 120–21). However, Plaintiff does not mention this fact in his briefs, and it is not identified as the cause of any injury. Since this was incidental to the officers' efforts to restrain Plaintiff in the course of making a lawful arrest and does not constitute a greater quantum of force than that used to direct Plaintiff to the ground and manipulate his arms for the purpose of applying the handcuffs, it does not change the analysis below nor does it alter the Court's ultimate conclusion that Defendant is entitled to a judgment in its favor.

cuffs and was never placed in a patrol car (SOF, D.E. No. 61 at 2–3, ¶¶ 10–16); (RSOF, D.E. No. 65 at 3, ¶¶ 10–16). Approximately five minutes passed from the time Officer Obando first touched Plaintiff to the time that the handcuffs were removed (Pltf.'s Depo., D.E. No. 65, Ex. 5 at 137). In his deposition, Plaintiff states that the officers apologized and, aside from telling them that his arm was hurting while the police were applying the handcuffs, Plaintiff did not complain about any pain, he did not ask for an ambulance, and he received no medical treatment on the scene. He did testify, however, that he was in too much pain to finish repairing the window and drove himself to the hospital 15 or 20 minutes after the police left (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 130–35).

Although the details of Plaintiff's treatment and prognosis are not in the record, Plaintiff describes the injury as a torn labrum in his shoulder. Plaintiff first underwent rehabilitation for approximately 6 months, which reduced the pain in his shoulder, but did not eliminate it. He therefore underwent surgery, which further improved his shoulder. Plaintiff states that his shoulder nevertheless hurts at night after he works in construction. He treats it with over-the-counter pain killers and a non-prescription patch (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 151–64).

## IV.  *ANALYSIS*

■ For the reasons explained in more detail below, Defendant is entitled to a judgment in its favor. A police officer's use of force is covered by presumption of good faith when he makes an arrest based on probable cause and, in this case, the police officers used standard procedures and a de minimis amount of force when they arrested Plaintiff, who they suspected of being a burglar, and thus Defendant cannot demonstrate that they acted in bad faith.

In addition, even if the police did not use de minimis force as a matter of law, the amount of force used was nevertheless objectively reasonable in light of the circumstances of this case as a whole when viewed from the perspective of a reasonable officer on the scene. Among other things, Plaintiff appeared to be burglarizing a residence in a high-burglary area close to a school, he appeared to completely ignore the police when they approached him, and he appeared to resist arrest. The officers in this case did not exert more force than was necessary to handcuff Plaintiff, notwithstanding the fact that Plaintiff allegedly sustained a shoulder injury that required surgery. *See Smith v. City of Atlanta*, No. 1:08–CV–2618–BBM, 2009 WL 2589633, at *9 (N.D.Ga. Aug. 19, 2009) ("[T]he court need not find that the injury was de minimis [ ] in order to determine that the force was reasonable.").

### A.  *De Minimis Force*

■ Defendant's threshold argument is, essentially, that there are certain commonplace displays of force that police are allowed to utilize in the course of making an arrest including twisting a suspect's arm for the purpose of applying handcuffs— that always constitute de minimis force as a matter of law (D.E. No. 61 at 8–10).

The Court agrees that this is a case in which police were entitled to arrest Plaintiff and, in doing so, were also entitled to apply force to get him to lie face down on the ground as well as to manipulate his arm for the purpose of applying handcuffs. There is no genuine issue of material fact to counteract the good-faith presumption that attaches to the officers who were forced to make crucial split-second decisions in the heat of the moment and used reasonable means to restrain a person that

they had probable cause to believe was burglarizing a home and resisting arrest. See Davis v. Williams, 451 F.3d 759, 768 (11th Cir.2006) ("Pursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest").

This conclusion holds whether Plaintiff's arm was injured during the initial takedown by Officer Obando, as Plaintiff contends in his affidavit, or whether it occurred when Plaintiff was on the ground and the handcuffs were being applied, as Plaintiff contends in his deposition.[6] In the following cases that appear in the note below, the courts found the officers' use of "de minimis force" to be determinative and, in all of those cases the officers imposed an equal or greater amount of force than the officers in this case.[7]

6. Because Defendant pointed out this inconsistency in its reply brief and noted that the later-filed affidavit "should be stricken as a matter of law" (D.E. No. 77 at 3), Plaintiff filed a motion for leave to file a surreply to address the so-called "implied motion to strike" (D.E. No. 87). While noting that Plaintiff's affidavit cannot easily be reconciled with his deposition testimony regarding the cause of his injury—i.e., the takedown or the handcuffing—the Court finds that it does not affect the ultimate determination of Defendant's motion for summary judgment and, therefore, Plaintiff's motion to file a surreply is rendered moot, since the Court considers the somewhat inconsistent statements in both the affidavit and the deposition transcript and finds that Plaintiff is not entitled to relief under either version of his narrative.

7. See Sullivan v. City of Pembroke Pines, 161 Fed.Appx. 906, 907 (11th Cir.2006) (the officer pushed the plaintiff "to the ground with her hands behind her back, placed his knee on her back and handcuffed her."); Durruthy v. Pastor, 351 F.3d 1080, 1085 (11th Cir.2003) (the officer grabbed the plaintiff "from behind[,] then pulled [him] onto the ground, while struggling to pin his arms behind him and handcuff him."); Rodriguez v. Farrell, 280 F.3d 1341, 1345 (11th Cir.2002) (the officer grabbed the plaintiff's "left arm, twisted it behind [his] back, and forced it up to just below the shoulder-blade" while the plaintiff "fell to the ground screaming in pain, telling" the officer "that he was hurting his arm," which the officer ignored in continuing to "complete [] the cuffing"); Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir.2000) (the officer, in attempting to break up what he perceived to be a fight, grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van"); Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1556 (11th Cir. 1993) (after the plaintiff "put his hands up," the officer "spun him around, placed him against a display case, applied a choke hold, and handcuffed him."); Ainsworth v. City of Tampa, No. 8:10–CV–293–T–23TGW, 2010 WL 996514, at *1 (M.D.Fla. Mar. 17, 2010) (the officer "reached into the vehicle, grabbed" the plaintiff "and yanked him violently from the vehicle before slamming [his] body violently to the ground causing serious injuries); Croom v. Balkwill, 672 F.Supp.2d 1280 (M.D.Fla.2009) (after the plaintiff told the officer that she could not comply with his order to "get down" any faster than she was moving because of her arthritis, the officer "placed her hand on Plaintiff's back and pushed her from the squatting position," then "placed her foot on Plaintiff's back and pushed her from the squatting position to the ground," where she remained "with her arms out in front of her," and the officer's foot on her back[,] for five to ten minutes," which caused "severe and permanent injuries" to her shoulders and back); Sosa v. Hames, 581 F.Supp.2d 1254, 1275–76 (S.D.Fla.2008) (the plaintiff arrived at his home by car while the police were executing a search warrant at his home and officers proceeded to pull the plaintiff "from his vehicle [and] thr[o]w [him] to the ground face down" before handcuffing and arresting him); Anderson v. City of Tampa, 555 F.Supp.2d 1268, 1271 (M.D.Fla.2008) (despite the plaintiff's inability to comply with the officer's orders to put his hands behind his back because of his "bad shoulder," the officer "pulled his arms out and kicked both feet out from under him."); Mladek v. Day, 320 F.Supp.2d 1373, 1376 (M.D.Ga.2004) (after the officer handcuffed the plaintiff's right wrist, he then "violently and forcefully yanked, pulled and slung" the plaintiff "by his wrist," causing "an acute sprain" and pushed

## B. Objective Reasonableness

That being said, the undersigned recognizes that there is some authority to suggest that it is not permissible to consider certain acts or injuries as "de minimis" *per se*, and that the "de minimis" label can only be applied to describe a use of force that is not excessive after considering all the circumstances surrounding the arrest, which includes balancing the amount of force used against the need for the use of force, as well as the extent of the injury. *Cf. Maiorano v. Santiago*, No. 6:05–CV–107–ORL–19KRS, 2005 WL 1200882, at *6 (M.D.Fla. May 19, 2005).[8]

▆▆▆▆ This does not change the outcome however, as the officers in this case unarguably used a reasonable amount of force to arrest Plaintiff. Pursuant to *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the determination of whether excessive force was used during an arrest "requires careful attention to the facts and circumstances of each particular case," while keeping in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. Thus, courts must examine "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted," *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir.2002), which typically requires an analysis of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

### 1. Seriousness of the Offense

The Court finds, at the outset, that the first *Graham* factor—the seriousness of the offense—clearly weighs in favor of the Defendant. *See Grimes v. Yoos*, 298 Fed. Appx. 916, 923 (11th Cir.2008) (noting, in examination of an excessive force claim, that "the defendants had reason to believe that the serious felony crime of burglary had recently occurred."); *see also Ewing v. California*, 538 U.S. 11, 30, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (defining "residential burglary" as a "serious felon[y]").

the plaintiff against a wall after the plaintiff requested medical attention); *Metcalf v. City of Tallahassee Police Dept.*, No. 4:00–CV–152–WS, No. 2001 WL 650724, at *5 (N.D.Fla. Apr. 20, 2001) (the plaintiff "was 'shoved' to the ground, 'kneed' in the back, 'jerked' up from the ground, and 'slung' into the car."); *Houston v. Tucker*, 137 F.Supp.2d 1326, 1331 (N.D.Ga.2000) (the officer "struck" the plaintiff, "grabbed her shoulders, and threw her against the wall of the house" with sufficient force to knock "several items off the wall and onto the porch.").

8. Although the undersigned recognizes that Plaintiff's claim against Defendant Miami–Dade under Count II asserts a cause of action for battery under State law (Compl., D.E. No.

1), the analytical framework for a Fourth Amendment claim is helpful in determining whether the officers' use of force was reasonable under the circumstances. *See DaSilva v. Lamberti*, No. 08–62106–CIV, 2010 WL 680925, at *1 (S.D.Fla. Feb. 24, 2010) ("[T]he elements and defenses of a battery claim against a law enforcement officer under Florida law are the same as those of an excessive force claim under the Fourth Amendment"); *Lehman v. Scott*, No. 2:08–CV–530, 2009 WL 1911070, at *13 (M.D.Fla. July 1, 2009). Both parties implicitly acknowledge this fact as their briefs exclusively rely on cases from federal, rather than state, jurisdictions to support their arguments regarding the reasonableness of the officers' use of force in this case.

### 2. *The Remaining Excessive Force Factors*

■ In examining the remaining factors relevant to an excessive force analysis—including whether the suspect poses an immediate threat to the safety of the officers or others, whether he is actively resisting arrest, whether he is attempting to evade arrest by flight, whether there is a need to apply force, whether the need to apply force is commensurate with the amount of force used, and the extent of the injuries inflicted—the Court must view the circumstances of the arrest through the eyes of the police officers on the scene.

After receiving a dispatch of a burglary of a residence in progress, the police arrived to find Plaintiff with his hands on an exterior window of the house, without any outward indications that he was a construction worker. The house is located in a high-burglary residential neighborhood in close proximity to a school.

As Officer Obando approached Plaintiff, he called out to him and, as Plaintiff mentions in his deposition, Officer Obando addressed him clearly enough that Plaintiff knew that Officer Obando was speaking to him and not to someone else. While a reasonable police officer in this situation would surely expect some form of acknowledgment—be it a shrug or a glance—Plaintiff completely ignored Officer Obando.[9] Plaintiff unconvincingly attempts to portray this as a completely innocuous fact because "he did not resist, he did not turn

[to] threaten" Officer Obando, "talk back to him or try to flee" (D.E. No. 64 at 4). To the contrary, from the perspective of a reasonable person in Officer Obando's position, who may have worried about the presence of an accomplice lying in wait, among other things, Plaintiff's absolute silence and stillness in this context would have been a reason for concern, rather than reassurance.

After having been caught engaging in suspicious behavior, a suspect's decision to simply carry on with his burglary is beyond suspicious it is brazen, or even bizarre.[10] In addition, Plaintiff's reaction—or, more accurately, his non-reaction—changed the light in which officers reasonably viewed other facts, especially those that might have militated against a determination that force was necessary. The fact that a suspect chose to rob a home in broad daylight through a window visible to the street, when coupled with the suspect's complete failure to respond to the police around him, could reasonably inspire a concern that Plaintiff was sufficiently unstable or unpredictable to pose a risk of dangerousness or flight, even though he may not have raised a fist or broken out into a sprint. An officer might regret waiting politely if the suspect were stalling for the arrival of an accomplice. And, at the very least, a reasonable officer could interpret the Plaintiff's silence as a form of passive resistance.

---

**9.** Although the record does not clearly reflect what was said because Plaintiff does not speak English, the parties agree that Plaintiff was aware that Officer Obando was addressing him directly, even if he was not aware that Officer Obando was a police officer and even if he could not understand what Officer Obando was saying to him (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 114) ("I heard ... a word that somebody said *to me* in English.") (emphasis added).

**10.** Of course, Plaintiff would be inclined to see his own actions as reasonable because, among other things, he did not understand everything that was being said and did not realize that Officer Obando was a police officer. However, the facts must be viewed from the *officers'* perspective, not Plaintiff's perspective.

After this initial interaction, Officer Obando attempted to apprehend Plaintiff and faced more resistance. As Plaintiff states in his deposition, he "thought that somebody was holding [him] up or assaulting [him]" (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 117). Although the record does not clearly reflect how forcefully Plaintiff resisted Officer Obando, it is clear that he was not completely cooperative (*see* Ofr. Osmaly Poveda's Depo., D.E. No. 61, Ex. 3 at 23) ("If I remember correctly, [Plaintiff] was resisting. Like he was not letting them put the handcuffs. He didn't want them to . . . arrest him.").[11] And, once on the ground, Plaintiff continued to struggle, demanding that the police "stop twisting my arm" and protesting-presumably in Spanish, since he does not speak English—"Can't you see that I[am] working here? Can't you see that I am working here?" (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 118). *See Rodriguez v. Farrell*, 294 F.3d 1276, 1278 (11th Cir.2002) ("[A] police officer need not credit everything a suspect tells him[,] especially . . . when the officer is in the process of handcuffing a suspect."). There is no dispute that the police officers did not use any force after the handcuffs were applied, that they immediately helped him to his feet, resolved the situation within two minutes, and asked if he needed medical attention. They even offered an apology before leaving.

In light of these tense and uncertain circumstances it is inappropriate to second-guess Officer Obando's decision to approach Plaintiff the way that he did. Where, as here, a suspect seems like a ticking time-bomb, the undersigned does not read *Graham* and its progeny as a directive to police officers that they must

wait until the fuse reaches the charge before they are authorized to act. In this case, the police had probable cause to apprehend Plaintiff and were therefore permitted to use some degree of force to do so.

Even though he had not yet displayed outward signs of aggression, Plaintiff did appear to be resisting police officers—both by ignoring Officer Obando when he tried to talk to him as well as struggling when he was apprehended—and he appeared to be acting in a brazen, bizarre and unpredictable manner, which would lead a reasonable officer to conclude that a somewhat heightened degree of force was necessary. *See Harvey v. Stuart*, 296 Fed.Appx. 824, 827–829 (11th Cir.2008) (holding that the officers were entitled to use forceful means, including "a 'hammer lock' technique" to arrest the plaintiff, based on the fact that he "fled police and was uncooperative as the defendants tried to handcuff him," even though the evidence suggested that the plaintiff initially fled because he was "frightened" by the police, who suddenly drove up to him in an unmarked car and did not immediately identify themselves as police). There is nothing in the record to suggest that Plaintiff's injury, while unfortunate, resulted from a bad faith infliction of excessive force by the police or objectively unreasonable action by the police.

Although the result is dependent solely on the facts of *this* case, the undersigned notes that the police action in this case is significantly consistent with the police action in other similar cases where the officers were found to have used reasonable force as a matter of law based upon the facts of the case as a whole as well as the factors set out in *Graham v. Connor*, 490

---

11. Once again, the fact that Plaintiff's reaction may have been reasonable from his own perspective is not relevant to the resolution of this motion, in which it is only the *officers'* perspective that is relevant.

U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). For example, in *Durruthy v. Pastor*, 351 F.3d 1080 (11th Cir.2003), the plaintiff was thrown to the ground by the officer even though the offense leading to his arrest—resisting, obstructing or opposing an officer—was arguably less serious than the burglary at issue in this case and even though he did not pose an immediate threat nor did he attempt to flee.

Moreover, in *Secondo v. Campbell*, 327 Fed.Appx. 126 (11th Cir.2009), the plaintiff suffered a shoulder injury that left him with a level of impairment almost identical to Plaintiff's level of impairment in this case. *Compare* (Pltf.'s Depo., D.E. No. 61, Ex. 5 at 155) (indicating that his level of impairment is 6%) *with Secondo*, 327 Fed. Appx. at 129 (noting that the plaintiff's level of impairment was 8%). The *Secondo* court concluded that the amount of force used was not excessive even though the arrest "was for a relatively minor infraction and [the plaintiff] did not resist arrest in any way." *Id.* at 132–33.

In addition, the plaintiff in *Croom v. Balkwill*, 672 F.Supp.2d 1280 (M.D.Fla. 2009), had previously informed officers that she had arthritis, but was nevertheless pushed to the ground when officers executed a search warrant. She was particularly unlikely to harm police or flee because at the time the warrant was executed she was sitting outside watering a plant wearing only a one-piece bathing suit and holding only a garden hose in her hand.

The court in *Schultz v. Hall*, 365 F.Supp.2d 1218 (N.D.Fla.2005), found that the severity-of-the-crime factor, the danger-to-police factor and the extent-of-the-injury factor all weighed in the plaintiff's favor because she was arrested for non-violent offenses, indisputably posed no threat of immediate danger and suffered a hairline fracture of her left arm. However-

er, the court concluded that "a mild amount of resistance to handcuffing was met with a reasonably commensurate amount of force" as "the officers 'pulled,' 'violently wrenched,' or 'yanked'" the plaintiff's arms and, therefore, it entered summary judgment in favor of the defendants.

Finally, in *Sutherland v. Bradshaw*, No. 09–80872–CIV–COHN, 2010 WL 989226 (S.D.Fla. Mar. 16, 2010), the court entered summary judgment in favor of an officer who arrested the plaintiff for resisting arrest without violence by "first grabb[ing] his left arm near the shoulder and pitch[ing] him forward," then putting him in a choke-hold and grabbing his right arm, which was previously seriously injured, which caused the plaintiff to fall to his knees. During the struggle, another officer "held him down with his knee in [the p]laintiff's back, while" the first officer held on to the arm "as if he [was] try[ing] to dislocate" it. That officer continued to yank on the arm until the plaintiff felt a "sharp shock," which required surgery and continued to cause the plaintiff pain. *Id.* at *2–4.

## V. CONCLUSION

In sum, the police officers in this case had reason to suspect that Plaintiff was engaged in the inherently dangerous and serious crime of burglarizing a residence. From their perspective, his suspicious and unusual behavior—by appearing to burglarize a home on a residential street in broad daylight and by carrying on with the burglary unfazed by the police who were speaking directly to him—gave rise to a concern that he could act in an unpredictable manner and pose a threat to the police officers' safety or a risk of flight. And, at every stage of their brief interaction, Plaintiff appeared to resist arrest, from ignoring the police when they tried to

talk to him to struggling with the police when they attempted to handcuff him, either because Plaintiff thought that he was being assaulted or because he thought that he was being arrested without good cause or because he was simply in pain. Although Plaintiff offers varying accounts of how the injury occurred—whether it happened during the initial takedown or during the attempted handcuffing—it is true that the injury was somewhat serious, resulting in surgery and a 6% impairment. Nevertheless, the severity of the injury alone does not transform the police officers' action in this case from a good faith attempt to effectuate an arrest based on probable cause to a bad faith imposition of excessive force. There is no evidence to support Plaintiff's burden of proving that reasonable officers would have acted differently than the officers in subduing and handcuffing Plaintiff. Thus, based upon a thorough review of the record as a whole and for the reasons set forth above, it is

**ORDERED AND ADJUDGED** that

1. Defendant Miami–Dade County's Motion for Summary Judgment (**D.E. No. 61**) is **GRANTED.**

2. This case is **ADMINISTRATIVELY CLOSED** pending the resolution of the appeal of this Court's Order denying Defendant Jimmy Obando–Echeverry's Motion to Dismiss. This shall not affect the substantive rights of the parties. It is the responsibility of the parties to file a motion to reopen the case at the appropriate time.